**In re MED–ATLANTIC PETROLEUM CORPORATION, Debtor.**

**Nationsbank, N.A., Plaintiff,**

**v.**

**Macoil, Incorporated, et al., Defendants.**

**Aurin Primack, as Chapter 11 Trustee of Med–Atlantic Petroleum Corporation, Plaintiff,**

**v.**

**Macoil Incorporated, et al., Defendants.**

**Bankruptcy No. 94B43809 TLB. Adversary Nos. 94/8842A, 95/8093A, 96/9830A.**

United States Bankruptcy Court, S.D. New York.

April 28, 1999.

648

Tisdale & Associates, by Thomas L. Tisdale, New York City, for John Chandris.

Dickstein Shapiro Morin & Oshinsky, L.L.P., by Daniel M. Litt, Washington, D.C., for NationsBank, N.A.

Squadron, Ellenoff, Plesent & Sheinfeld, L.L.P., by David Posner, New York City, for Aurin Primack, Chapter 11 Trustee.

**1.** The above captioned cases were consolidated without prejudice for purposes of discovery and trial pursuant to a stipulation "so ordered" on September 11, 1998, by and among counsel for the trustee, Chandris, Macoil Incorporated, and NationsBank.

**2.** *See* 20 U.S.T. 361, T.I.A.S. No. 6638.

**3.** It should be noted from the court's docket that NationsBank filed a third amended complaint in these consolidated actions on April 23, 1998. Although an order was entered on October 5, 1998 granting the trustee leave to amend his first amended complaint, the docket does not indicate whether the trustee filed

## OPINION ON MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

TINA L. BROZMAN, Chief Judge.

### Introduction

Lack of personal jurisdiction is said to be grounds for dismissing these consolidated[1] adversary proceedings against John Chandris, a Greek national who is domiciled and resides in Greece. Chandris seeks to terminate the adversary proceeding commenced by the chapter 11 trustee of Med–Atlantic Petroleum Corporation and as well as those commenced by NationsBank, N.A. ("NationsBank"). Alleging that the trustee's service did not comply with the internal laws of Greece as required by the Hague Convention On the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965[2] (the "Hague Convention"), Chandris also moves to dismiss the trustee's complaint on the alternative grounds of improper service of process. NationsBank's second amended complaint[3] alleges, among other things, that Chandris intentionally engaged in fraud and co-conspired with Jacqueline J. Plecas and others to defraud NationsBank and the United States Government (the "Government") from 1990 through 1994. The trustee's complaint seeks to recover from Chandris certain fraudulent conveyances and unauthorized transfers. Chandris responded to the second amended complaint by filing an answer challenging personal

or served his second amended complaint. In his answers to the trustee's and NationsBank's previously amended complaints, Chandris asserted affirmative defenses based upon lack of personal jurisdiction. We will assume for purposes of this decision that Chandris has restated or would restate these jurisdictional defenses in his answers to the trustee's second amended complaint and NationsBank's third amended complaint. Therefore, even though Chandris does not refer to the trustee's and NationsBank's currently amended complaints in his motion, they are incorporated herein by reference.

jurisdiction, cross-claims and a counter-claim denying the allegations against him, challenging personal jurisdiction and seeking damages from the plaintiffs for having instituted such ill-considered litigation. In response, the trustee and NationsBank contend that this court has personal jurisdiction over Chandris and request that sanctions be awarded to them for having to respond to this motion.

## I.

Both Med–Atlantic Petroleum Corporation, a Delaware corporation ("MAPCO"), and Med–Atlantic Petroleum Corporation, a New York Corporation ("MAPCO–NY") were petroleum traders in the business of supplying marine fuel oil pursuant to contracts on which they had bid. According to Plecas' testimony, MAPCO–NY and MAPCO were formed in 1988 and 1989, respectively, however, MAPCO did not transact any business until September 1989. Although MAPCO–NY transacted all of the commercial business and bid contracts with the Government, they were performed by MAPCO. Since 1989, MAPCO either maintained an office in New York or, as Plecas testified, a "New York presence in an office" when she moved to Washington, D.C. MAPCO is a chapter 11 debtor whose affairs are administered by a chapter 11 trustee, Aurin Primack.

According to Chandris, at all relevant times, he was the principal of Macoil, Incorporated ("Macoil"), a Liberian corporation with its office in Greece, and was not involved in any capacity in the daily management of MAPCO. Contrary to NationsBank's and the trustee's allegation and Plecas' testimony that Chandris consented to be a director of MAPCO, Chandris contends that he never agreed to serve as a director nor did he hold himself out as one. Although he says that Plecas was the former president and owner of MAPCO who ran its affairs, Plecas testified that Chandris in effect controlled MAPCO by extending credit as needed and that she could not make a financial decision without

his agreement. Notwithstanding Chandris' assertions, there having been no evidentiary hearing on personal jurisdiction, we look at plaintiffs' averments, it being their burden at this stage to make only a *prima facie* showing which is factually supported. *See* section IV *infra.*

Chandris asserts that he has been to the United States only twice, most recently during a vacation to New York City in early July 1991 for Fleet Week during which he attended a few social business meetings in his capacity as representative of Macoil. He and his wife also attended several of the Fleet Week functions as guests of Plecas. Chandris maintains that he never had any contact individually or in his capacity as a representative of Macoil with NationsBank other than with a former bank officer during Fleet Week. He also insists that he has never conducted personal business, owned real property, possessed bank accounts, or taken any affirmative act to purposefully avail himself of the benefits and protections of United States law.

Macoil was in the business of supplying fuel on the spot market to ships at ports which were primarily located in the Eastern Hemisphere. According to Chandris, during the years in question, Macoil sold oil to MAPCO on the open market, neither possessing a contract with MAPCO to supply fuel at a price certain nor holding itself out as having purchased fuel from MAPCO. Rather, he says, MAPCO was free at any time to purchase fuel from any other supplier. Although neither Macoil nor Chandris had a contractual relationship with the Government or with Med–Atlantic, MAPCO was obligated to sell to the Government at a price certain, regardless of the purchase price on the open market or from Macoil.

NationsBank alleges that Macoil and Chandris participated in a fraudulent scheme by falsely representing to NationsBank sales made by MAPCO to Macoil. NationsBank avers that MAPCO fraudulently created invoices showing fuel sales

to Macoil, thereby generating fraudulent accounts receivable from Macoil against which NationsBank lent funds. These fraudulent accounts receivable were allegedly offset by MAPCO's fraudulent accounts payable to a third supplier. Plecas admitted the falsity of the invoices at her deposition and testified that she, Chandris and John Santana, a co-conspirator, had agreed to overcharge the Government by, among other schemes, rigging the bids submitted to the Mar Ship Operators ("M.S.O"), which was owned by the same parent company as MAPCO. She has pled guilty to intentionally overcharging the Government as well as to numerous other criminal charges, such as tax evasion, perjury and bribery. (Santana has also pled guilty to charges arising out of the parties' activities.)

Chandris argues that he did not, either individually or as principal of Macoil, make any representations to NationsBank in 1991 or at any subsequent time, fraudulent or otherwise. He further argues that neither he nor Macoil knew that MAPCO and Plecas were creating fictitious invoices showing sales to Macoil or that Med–Atlantic was using Macoil's name in the perpetration of its fraud against NationsBank. Further, he says, neither Macoil nor Chandris ever made any representations of any sort to NationsBank regarding the existence of alleged sales from MAPCO to Macoil or had a credit relationship with NationsBank. According to Chandris, after Macoil first appeared through its counsel in April 1995, it advised NationsBank that MAPCO's purported setoff was false and that Macoil never purchased fuel from MAPCO. According to Chandris, documents from the files of MAPCO show that MAPCO and Plecas fraudulently reversed sales from Macoil to MAPCO without the knowledge, participation or involvement of Macoil or Chandris, in order to show purported sales from MAPCO to Macoil. Chandris asserts that MAPCO and Plecas, not he, created the invoices to maintain the company's borrowing ability. Moreover, Chandris contends, neither he nor Macoil ever signed, reviewed or participated in the preparation and presentation of the inflated borrowing base certificates to NationsBank. Chandris also maintains that the borrowing base certificates which allegedly contained these misrepresentations did not show the status of MAPCO's accounts payable, which would have reflected the purchases from Macoil, because they merely showed the levels of MAPCO's accounts receivable from government or commercial sources for purposes of evaluating MAPCO's borrowing availability under its line of credit.

Notwithstanding Chandris' assertions that Plecas has wrongly implicated him, NationsBank argues that the testimony of Plecas and Chandris, combined with other evidence, establish that Chandris, Plecas and others:

(i) engaged in a conspiracy to defraud the Government by rigging bids for fuel oil sales so as to inflate the sales price of fuel to MSO which was passed on by MSO to the Government;

(ii) engaged in a conspiracy to defraud NationsBank of loan proceeds by presenting fraudulent invoices, accounts receivable and other documents to NationsBank;

(iii) engaged in a conspiracy to defraud the Government by charging the Government prices for fuel oil in excess of MAPCO's contract price, notwithstanding MAPCO's contractual agreement with the Government to charge it the correct amount;

(iv) engaged in a conspiracy to defraud NationsBank by submitting borrowing base certificates to NationsBank which, *inter alia*, certified that *bona fide* accounts receivable were due from the Government, notwithstanding that the borrowing base certificates included accounts receivable from the Government based on the overcharges;

(v) engaged in a conspiracy to defraud NationsBank by submitting borrowing base certificates to NationsBank which

certified, as bona fide, fraudulent accounts receivables from Macoil, as well as other fraudulent representations;

(vi) prepared and delivered to MAPCO inflated invoices from Macoil so that, *inter alia*, it would appear that MAPCO's (and Macoil's) "profits" from fuel oil sales were reasonable or within industry norms (the "Macoil–MAPCO Invoices"); and

(vii) prepared and delivered to Plecas on behalf of MAPCO certain "credit notes" which operated as a credit against the Macoil–MAPCO Invoices and MAPCO's inflated and fictitious debts to Macoil. Payments on the "credit notes" were deposited into a bank account in London which was controlled by Chandris.

NationsBank argues that jurisdiction has been obtained over Chandris through the acts of his co-conspirators, Plecas and others, and by the tortious acts Chandris committed or caused to be committed in New York and in Washington, D.C. It also contends that jurisdiction is appropriate under the Due Process Clause of the Fifth Amendment which only requires "minimum contacts" with the United States, a much broader standard than New York's Civil Practice Laws and Rules.

## II.

■ The trustee and NationsBank challenge Chandris' motion on several grounds, the first being that by asserting cross-claims against several of the defendants and a so-called permissive counterclaim against NationsBank, Chandris has voluntarily submitted to the jurisdiction of this court and waived any defense of lack of personal jurisdiction he might have had.

Courts have grappled with the issue whether the assertion of a claim for affirmative relief constitutes a waiver of the defense of lack of personal jurisdiction. "The language of the federal rules is of little help on this question." 5 Wright & Miller, Federal Practice and Procedure, § 1397, at 786 (2d ed.1990). For although rules 12(b) and 12(h)(1) of the Federal

Rules of Civil Procedure provide that jurisdictional defenses are not waived when they are included in and joined with one or more other defenses or objections in a responsive pleading, the federal rules are silent regarding the effect of interposing an affirmative claim for relief upon the asserted defense of lack of personal jurisdiction. Moreover, the "federal law on this issue appears to be in disarray." *Cargill, Inc. v. Sabine Trading & Shipping Co., Inc.,* 756 F.2d 224, 229 (2d Cir.1985) (court held that appellees, by asserting a counterclaim which did "not arise from the transaction that is the subject of appellant's claim but, rather, from the method by which appellant obtained jurisdiction" did not submit to the court's jurisdiction under general waiver principles.)

In a number of earlier decisions, courts were of the view that a party who invoked the power of the court for his own purposes by asserting a claim for affirmative relief waived the defense of lack of personal jurisdiction because the party "should not be allowed the inconsistent objection that the forum was personally inconvenient for him." Wright & Miller, *supra* § 1397 at 788 (citing *Freeman v. Bee Mach. Co.,* 319 U.S. 448, 63 S.Ct. 1146, 87 L.Ed. 1509 (1943)). *See also In re NDEP Corp.,* 203 B.R. 905, 910 at n. 4 (D.Del.1996); *Merz v. Hemmerle,* 90 F.R.D. 566, 569 (E.D.N.Y. 1981); *Beaunit Mills, Inc. v. Industrias Reunidas F. Matarazzo, S a,* 23 F.R.D. 654 (S.D.N.Y.1959). A number of courts distinguished between compulsory and permissive counterclaims, reasoning that a compulsory counterclaim—a creature of Federal Rule 13(a)—is not a voluntary invocation of jurisdiction. *See, e.g., Dragor Shipping Corp. v. Union Tank Car Co.,* 378 F.2d 241, 244 (9th Cir.1967); *Hasse v. American Photograph Corp.,* 299 F.2d 666 (10th Cir.1962). Others determined that a defendant's assertion of either a compulsory or permissive counterclaim does not constitute a waiver of a personal jurisdiction defense asserted in the same pleading. *See, e.g., Gates Learjet Corp. v. Jensen,*

743 F.2d 1325, 1330 at n. 1 (9th Cir.1984). "One interpretation equates counterclaims with 'other defenses,' so that jurisdictional defenses are not waived when they are joined with a counterclaim." *In re Inter-Carbon Bermuda, Ltd. v. Caltex Trading and Transport Corp.*, 146 F.R.D. 64, 69 (citing *e.g., Keil Lock Co. v. Earle Hardware Mfg. Co.*, 16 F.R.D. 388 (S.D.N.Y. 1954)).

More recently, a number of courts, paying heed to the purposes behind the federal rules to streamline the litigation process, avoid delays caused by successive motions and pleadings, and eliminate the need for asserting special appearances to assert jurisdictional defenses, have held that a party's filing of a counterclaim in the same pleading in which he asserts an objection to jurisdiction does not operate as a waiver of the objection. *See, e.g., Campbell v. Bartlett, 975 F.2d 1569* (10th Cir.1992); *Gates Learjet*, 743 F.2d at 1330; *Chase v. Pan–Pacific Broadcasting, Inc.*, 750 F.2d 131 (D.C.Cir.1984). *See also Bayou Steel Corp., et al. v. M/V Amstelvoorn*, 809 F.2d 1147, 1149 (5th Cir.1987); and *generally* Wright & Miller, *supra* § 1397 at 790 (stating view that "trend in more recent cases is to hold that no Rule 12(b) defense is waived by the assertion of a counterclaim, whether permissive or compulsory").

It is not necessary, however, to announce a general view in the absence of our circuit court having done so, for this case is analogous to the decision of the Second Circuit in *Cargill*, 756 F.2d 224. There, the circuit court held that a counterclaim based solely on damages incurred as a result of the attachment used to acquire asserted *quasi in rem* jurisdiction did not waive by consent the objection to the assertion of that jurisdiction. The court pointed out that the counterclaim "[did] not arise from the transaction that is the subject of appellant's claim but, rather, from the method by which appellant obtained jurisdiction." *Id.* at 229. In much the same vein, Chandris' counterclaim seeks damages and sanctions for the assertion of claims against him which he says were not the subject of diligent inquiry and were therefore interposed in bad faith. He does not assert counterclaims either wholly unrelated to the transactions contained in the plaintiffs' complaints nor arising out of the substance of those same transactions. All he says, in essence, is that if the plaintiffs do not prevail, then he is entitled to be compensated for having been plunged into this litigation. Accordingly, I conclude that Chandris, by asserting his cross-claims and counterclaim, did not waive his objection to personal jurisdiction. So if is to the challenge to that jurisdiction that we now turn.

### III.

■ Chandris would have this court evaluate whether it has obtained personal jurisdiction over him under the amendments to Fed.R.Civ.P. 4 which became effective on December 1, 1993. Although Fed.R.Civ.P. 4 is made applicable here by Fed.R.Bankr.P. 7004, it was not until the 1996 amendments to the Federal Rules of Bankruptcy Procedure that consistency between Fed.R.Bankr.P. 7004(f) and Fed. R.Civ.P. 4(k)(2) was achieved. *See* 10 L. King *et al.*, COLLIER ON BANKRUPTCY, ¶ 7004.07 at 7004–31 (rev. 15th ed.1999). In response, the trustee and NationsBank contend that personal jurisdiction should be determined under the long-arm statute of New York, the forum state.

The complete overhaul of Fed.R.Civ.P. 4 that took effect on December 1, 1993 included significant revisions to territorial limits on effective service. "Under the pre–1993 version of Rule 4, subdivision (i) contained the provisions for service in a foreign country. Under the current rule, subdivision (f) is the governing provision." Siegel, *Supplementary Practice Commentaries on Fed.R.Civ.P. 4,* reprinted in 28 U.S.C.A. Rule 4 (1998 Cum.Ann. Pocket Part) at 64 (1998). In addition, a new

subdivision (k)(2)[4] was added as part of the 1993 revisions, which acts as a "kind of general long-arm statute akin to those that some states have adopted, [which] ... authorizes extraterritorial jurisdiction whenever its exercise would be consistent with the requirements of due process in the particular case." Siegel, *supra* at 86. New subdivision (f)(1) of Rule 4, which took effect on December 1, 1993, addresses the role of the Hague Convention when service is made in a foreign country. *See* Fed.R.Civ.P. 4(f)(1). In addition, Bankruptcy Rule 7004 was amended to include a new subdivision (f) to be consistent with the 1993 amendments to Fed.R.Civ.P. 4(k)(2) to "clarif[y] that service or filing of a waiver of service in accordance with this rule or the applicable subdivisions of Fed. R.Civ.P. 4 is sufficient to establish personal jurisdiction over the defendant." FED. R.BANKR.P. 7004 advisory committee's note. Chandris argues that because the amendments to Bankruptcy Rule 7004, which became effective on December 1, 1996, were made "to conform the rule to the 1993 revisions of Rule 4 Fed.R.Civ.P. and to make stylistic improvements" the rule, as amended, should govern service upon him. *See* FED.R.BANKR.P. 7004 advisory committee note.

As a result of the 1996 amendments, Bankruptcy Rule 7004(e), which governed service in a foreign country, was abrogated and Federal Rules 4(f) and (h)(2), as substantially revised in 1993, were made applicable to adversary proceedings. Therefore, Chandris asserts, the 1996 amendments to the Bankruptcy Rules combined with new Federal Rule 4 ren-

ders the New York Civil Practice Law & Rules ("C.P.L.R.")-based inquiry obsolete. This is so, he says, because new Rule 4 appears considerably broader in scope than its predecessor and seems to now provide a mechanism for worldwide service of process which its predecessor did not. If the new procedure provides for worldwide service of process, I would not have to look to the C.P.L.R. to determine whether personal jurisdiction exists over Chandris. *See In re Levant Line, S.A.*, 166 B.R. 221, 233 (Bankr.S.D.N.Y.1994) (citations omitted). Similarly, the Due Process Clause of the Fifth Amendment, rather than the Fourteenth Amendment, would provide the constitutional limits on the court's exercise of personal jurisdiction over Chandris. *Id.* at 233 (citations omitted). In such circumstances, the U.S. Constitution requires only that the defendant have the requisite "minimum contacts" with the United States, rather than with New York. *Id.* (citation omitted).

The question to be answered is whether it is "just and practicable" to apply the amended rule to this dispute (in light of the fact that the amendments became effective during the pendency of the case but after service of process was made). *See* Order of the Supreme Court of the United States Adopting and Amending Rules, April 22, 1993; *see also* 28 U.S.C. § 2074(a)[5]. Here, to permit the retroactive application of the 1996 amendments to Bankruptcy Rule 7004 would not be just and practicable, but rather, would work an injustice to the trustee and NationsBank, who, in considering in which one of the available fora they should proceed and in

---

4. Fed.R.Civ.P. 4(k)(2) provides that "[i]f the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state."

5. 28 U.S.C. § 2074(a) provides, in pertinent part, that "[t]he Supreme Court may fix the extent [that a new rule or amendment] shall apply to proceedings then pending, except that the Supreme Court shall not require the application of such rule to further proceedings then pending to the extent that, in the opinion of the court in which such proceedings are pending, the application of such rule in such proceedings would not be feasible or would work injustice, in which event the former rule applies."

which manner they should effect service of process, relied upon the then-applicable language of Bankruptcy Rule 7004, that is, as it existed prior to the 1996 amendments. Accordingly, jurisdiction and service of process are to be viewed through the prism of the pre–1996 version of Federal Rule of Bankruptcy Procedure 7004.

█ In connection with an adversary proceeding pending in a bankruptcy court, prior to the 1996 amendments to the Federal Rules of Bankruptcy Procedure, Bankruptcy Rule 7004(e) governed service of process in a foreign country. *See Levant Line*, 166 B.R. at 229; *In re New York Trap Rock Corp.*, 155 B.R. 871 (Bankr.S.D.N.Y.), *aff'd*, 160 B.R. 876 (S.D.N.Y.1993). This rule, titled "Service on Debtor and Others in Foreign Country" provided that:

> The summons and complaint and all other process except a subpoena may be served as provided in Rule 4(d)(1) and (d)(3) Fed.R.Civ.P. in a foreign country (A) on the debtor, any person required to perform the duties of a debtor, any general partner of a partnership debtor, or any attorney who is a party to a transaction subject to examination under Rule 2017; or (B) on any party to an adversary proceeding to determine or protect rights in property in custody of the court; or (C) on any person whenever such service is authorized by a federal or state law referred to in Rule 4(c)(2)(C)(i) or (e) Fed.R.Civ.P.

Here, subsection (A) is inapplicable as Chandris is a non-debtor being served in a foreign country. *Levant*, 166 B.R. at 229. Subsection (B) is also inapplicable, because "the property in custody contemplated by that subsection is the type of tangible property in the custody of the court which gives rise to jurisdiction in rem to determine even a foreign defendant's rights in such property." *Id.* at 229 (citations omitted). Subsection (C), the remaining provision available for service in a foreign country, directs the court to look to Federal Rule 4 and, particularly for our purposes, to subsection 4(e).

As I previously stated in *Levant*, Federal Rule 4(e) normally requires the federal court to look either to a federal statute or to the long-arm statute of the state in which it sits to determine whether a defendant is amenable to service. *Id.* at 229 (citing *Omni Capital International v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 105, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987)). The Supreme Court noted in *Omni*, "[t]his assumes, of course that the defendant is not 'an inhabitant of or found within the state,' Fed.Rule Civ.Proc. 4(e), and has not consented to service." *Id.* at 105 n. 9, 108 S.Ct. 404. Up until December 31, 1993, with certain exceptions not here relevant, no federal statute, including the Bankruptcy Code and its rules, authorized service of an adversary complaint on foreign defendants. *See Levant*, 166 B.R. at 230 (citations omitted). Because Chandris has not expressly or impliedly consented to service, personal jurisdiction over him will exist if Chandris is amenable to service under New York's long-arm statute. *See* N.Y.C.P.L.R. § 302 (McKinney 1990). It is to this issue that we now turn.

### IV.

█ In their opposition to Chandris' dismissal motion, the trustee and NationsBank assert that I have personal jurisdiction over Chandris under either C.P.L.R. § 301 or any of the three provisions of New York's long-arm statute: C.P.L.R. § 302(a)(1), § 302(a)(2) and § 302(a)(3). On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff has the burden of proving that the court has personal jurisdiction over the defendant. *See Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 566 (2d Cir.1996) (citation omitted). The procedural posture of a case determines what level of proof a plaintiff has to meet. *Ball v. Metallurgie Hoboken–Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.1990). Prior to discovery, a plaintiff may survive a 12(b)(2)

motion by alleging facts that would support a *prima facie* showing of jurisdiction. *Metropolitan Life,* 84 F.3d at 566 (citing *Ball,* 902 F.2d at 197). If discovery is not yet completed, the plaintiff may rely upon its affidavits and pleadings, which "are to be construed in the light most favorable to the plaintiff, with all doubts resolved in plaintiff's favor." *Sierra Rutile Ltd. v. Shimon Y. Katz,* 1992 WL 236208 at *8 (S.D.N.Y. Sept. 8, 1992) (citing *CutCo Industries,* 806 F.2d at 365). To defeat a jurisdiction-testing motion after discovery but before the holding of an evidentiary hearing, plaintiff must make a *prima facie* showing of jurisdiction, in which it must aver facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant. *Metropolitan Life,* 84 F.3d at 567 (quoting *Ball,* 902 F.2d at 197). *See also Madanes v. Madanes,* 981 F.Supp. 241 (S.D.N.Y.1997); *Pilates v. Pilates Inst., Inc.,* 891 F.Supp. 175, 178 (S.D.N.Y. 1995). If jurisdiction is tested following an evidentiary hearing after discovery, jurisdiction must be established by a preponderance of the evidence. *Ball,* 902 F.2d at 196–197.

■ Discovery in these actions has not been quite completed; what is yet to be obtained may relate to the issue of personal jurisdiction. Whereas Chandris asks now for an evidentiary hearing, absent appropriate discovery having been completed, I decline to offer that hearing and will instead hold the plaintiffs to the stronger showing at trial if they meet their somewhat lesser burden to survive this motion. For now, they must aver facts that, if credited by the trier, would suffice to establish that Chandris, either based upon his own tortious acts or the imputed acts

of his co-conspirators, had sufficient contacts with New York such that traditional notions of fair play and substantial justice are not offended by the exercise of jurisdiction over him[6]. *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *Marine Midland, Bank N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir.1981). If such a showing can be made, I must then assess whether this court's assertion of jurisdiction under C.P.L.R. §§ 301 and 302(a)(1), (a)(2) and (a)(3) comports with the requirements of due process.

### A. C.P.L.R. Section 301—"Doing Business"

■ C.P.L.R. § 301 states that a New York court "may exercise jurisdiction over persons, property, or status as might have been exercised heretofore." Pursuant to section 301, a foreign corporation will be subject to personal jurisdiction in New York if it is present or is "doing business" in the state by engaging in a continuous and systematic course of activity. *Frummer v. Hilton Hotels International, Inc.,* 19 N.Y.2d 533, 281 N.Y.S.2d 41, 227 N.E.2d 851, *cert. denied,* 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967). However, whether a foreign individual, as opposed to a corporation, who is "doing business" in New York may be subject to personal jurisdiction under section 301 is unclear in the absence of any decision of the New York State Court of Appeals addressing this issue[7]. *See Hoffritz For Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 58 (2d Cir.1985); *see also The Hearst Corp. v. Goldberger,* 1997 WL 97097 at *8, 1997 U.S. Dist. LEXIS 2065 at *24

6. Technically, reliance upon affidavits would probably suffice since discovery is still open. Plaintiffs, however, have made a considerably stronger showing than that.

7. The New York State Appellate Division cases on this issue are divided. Compare *In re Nilsa B. v. Clyde H.,* 84 A.D.2d 295, 445 N.Y.S.2d 579 (2d Dep't 1981) (holding that C.P.L.R. § 301 does not confer personal juris-

diction over a natural person who transacts business in New York) with *ABKCO Indus., Inc. v. Lennon,* 52 A.D.2d 435, 384 N.Y.S.2d 781 (1st Dep't 1976) (Silverman, J., dissenting) (natural person who is "doing business" in New York is subject to the court's personal jurisdiction under section 301 with respect to causes of action which did not arise in New York).

(S.D.N.Y. Feb. 26, 1997). ("It is unclear whether an individual (as opposed to a corporation or other entity) is subject to 'doing business' jurisdiction under section 301 pursuant to New York law.") I need not, however, resolve the question of whether section 301 "doing business" jurisdiction may be exercised over Chandris because, even assuming that this jurisdictional basis is available, NationsBank and the trustee have made an insufficient showing of a *prima facie* case for personal jurisdiction under this provision. "The New York courts, in applying the pragmatic test for section 301 jurisdiction, have focused upon factors including the existence of an office in New York; the solicitation of business in the state; the presence of bank accounts and other property in the state; and the presence of employees of the foreign defendant in the state." *Hoffritz For Cutlery*, 763 F.2d at 58 (citations omitted).

Plaintiffs tie personal jurisdiction under section 301 to Chandris' intentional conducting of business in New York in furtherance of the fraudulent schemes by either attending meetings or communicating with one or more of his co-conspirators in New York, participating in fraudulent activities with MAPCO, which had offices in New York, or causing Macoil to sell fuel to MAPCO for resale to the City of New York. Although such activities may be sufficient to establish personal jurisdiction under section 302 either through Chandris' own tortious acts or the tortious acts of his co-conspirators as agents, they are insufficient contacts with New York to bring Chandris within the jurisdiction of this court under section 301. Plaintiffs also pin jurisdiction on a bank account of Casablanca maintained in New York. According to Plecas' testimony, Chandris was not only the president of Casablanca but also one of several signatories with withdrawal authority on its New York bank account into which funds were deposited and withdrawn. Citing to *United Rope Distributors, Inc. v. Kimberly, Inc.*, 770 F.Supp. 128 (S.D.N.Y.1991), plaintiffs suggest that

the existence of Casablanca's bank account is a sufficient contact with New York to uphold jurisdiction. However, unlike the third-party plaintiff in *United Rope*, which made a *prima facie* showing that the foreign third-party defendant, via its agent, conducted systematic financial activities in New York through a bank account maintained in New York for the receipt of virtually all of its income and payment of expenses on its behalf, plaintiffs here have not demonstrated such systematic financial activities in New York. Therefore, I find that the trustee and NationsBank have not established jurisdiction over Chandris under C.P.L.R. § 301, and it is New York's long-arm jurisdiction statute which must provide a grounding for personal jurisdiction.

### B. C.P.L.R. Section 302—"Long–Arm" Jurisdiction

C.P.L.R. § 302(a)(1) provides in pertinent part that "[a]s to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, …, who in person or through an agent transacts any business within the state or contracts anywhere to supply goods or services in the state." Personal jurisdiction over a non-domiciliary may be exercised if either of the two prongs in this subsection is satisfied. *See, e.g., Holness v. Maritime Overseas Corp.*, 251 A.D.2d 220, 676 N.Y.S.2d 540, 544 (1st Dep't 1998). C.P.L.R. § 302(a)(1) authorizes the court to exercise jurisdiction over a non-domiciliary for contract and tort claims arising from a defendant's transaction of business in New York. *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195, 198, 522 N.E.2d 40 (1988). Under either prong of this subsection, a court may obtain personal jurisdiction over a party who is not physically present in the state at the time of service. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 786 (2d Cir.1999) (citing *Parke–Bernet Galleries v. Franklyn*,

26 N.Y.2d 13, 16, 308 N.Y.S.2d 337, 339, 256 N.E.2d 506 (1970)). "[Section 302(a)(1)] is a "single act statute" and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Kreutter*, 527 N.Y.S.2d at 198–199, 522 N.E.2d 40.

 I find that Chandris is amenable to personal jurisdiction under this subsection based upon his own acts and those of Macoil. Jurisdiction over a non-domiciliary may be obtained under section 302(a)(1) where the non-domiciliary has transacted business through an agent, notwithstanding the absence of a formal agency relationship. *See Yurman Designs, Inc. v. A.R. Morris Jewelers L.L.C.*, 1996 WL 497027, *3, 1999 U.S. Dist. LEXIS 2638 (S.D.N.Y. Mar. 10, 1999). "[C]ourts focus on the 'realities of the relationship in question' to determine whether the agent acted in New York 'for the benefit of, and with the knowledge and consent of the non-resident principal.'" *Id.* at *14 (citing *Alto Products Corp. v. Ratek Industries Ltd.*, 1996 WL 497027 at *3, 1996 U.S. Dist. LEXIS 12812 at *8 (S.D.N.Y. Sept. 3, 1996)). If so, the fiduciary shield doctrine is not available to permit the non-resident principal to defeat jurisdiction under New York's long-arm statute. *See Kreutter*, 71 N.Y.2d 460, 527 N.Y.S.2d 195, 522 N.E.2d 40. "Courts look at the totality of the circumstances in order to determine whether or nor the defendant engaged in some 'purposeful activity in New York in connection with the matter in controversy.'" *See, e.g., Optimum Worldwide Ltd. v. Klebener*, 1996 WL 71500 at *3, 1996 U.S. Dist. LEXIS 1740 at *7 (S.D.N.Y. Feb. 16, 1996) (citations omitted).

Here, the deposition testimony and exhibits reflect that Chandris met with Plecas and others of his co-conspirators in Fire Island, New York[8], to plan the creation of Casablanca, a foreign shell corporation, to hold Chandris' 29 percent interest in MAPCO; that he met at MAPCO's offices in New York that same week for further discussions regarding overcharging the Government and bidding on new Government contracts in furtherance of their conspiracy; that he sent correspondence to MAPCO and Plecas; that he responded or caused his employees to send to MAPCO's auditors fraudulent certifications of fuel inventory or money in a "guaranty account;" that he wrote a letter to the City of New York on behalf of MAPCO holding himself out as owning Casablanca which in turn owned 29 percent of MAPCO; that he was an officer, director and shareholder of MAPCO which maintained a New York office and, at the very least, a "New York presence in an office" when MAPCO's Washington, D.C. office was opened; that he was an officer, director and shareholder of Casablanca, which had a bank account in New York; that Macoil sold many millions of dollars' worth of fuel (some at overcharge prices) to MAPCO while it was in New York; that he was in daily contact with Plecas while she resided in New York regarding their fraudulent scheme, the operation of MAPCO, Casablanca, the NationsBank loan and the Government contracts; that he personally directed Plecas on how to bid on the Government contracts below the market while MAPCO had offices in New York; that he sent hundreds of fraudulent invoices from Greece to New York over a span of a few years; that he solicited the City of New York to enter into a contract with MAPCO; that he caused Plecas to attempt to "transfer" the New York City contract to MAPCO–NY or Med–Atlantic Bahamas, which did not have lines of credit with NationsBank, after Na-

---

**8.** "Meetings which are partially social in nature, as well as meetings which merely create the likelihood of a more solid business relationship are a sufficient basis for the exercise of in personam jurisdiction." *Optimum Worldwide*, 1997 WL 433470 at *5, 1997 U.S. Dist. LEXIS 11097 at *14.

tionsBank issued a letter demanding payment from Macoil of $5 million in bank certified receivables owed to MAPCO. If the evidence at trial is believed, these contacts with New York, in their totality, are sufficient to establish that Chandris purposefully engaged in activity in New York in connection with the schemes alleged in the complaints such that he may be found to have transacted business.

■■■ Chandris' activities in New York yield the same result under C.P.L.R. § 302(a)(2). C.P.L.R. § 302(a)(2) provides that "a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent ... commits a tortious act within the state," where the cause of action arises from that act. A defendant's physical presence in New York is a prerequisite to jurisdiction. *See Bensusan Restaurant Corp. v. King,* 126 F.3d 25 (2d Cir.1997). "[T]he acts of a co-conspirator may be attributed to a defendant in an appropriate case for purposes of obtaining personal jurisdiction over that defendant under the long-arm statute." *Lehigh Valley Indus., v. Birenbaum,* 389 F.Supp. 798, 807 (S.D.N.Y.1975), *aff'd,* 527 F.2d 87 (2d Cir.1975). The out-of-state defendant may be held responsible for the acts of a co-conspirator carrying out activities in New York in accordance with the conspiracy. *Socialist Workers Party v. Attorney Gen. of the United States,* 375 F.Supp. 318, 321 (S.D.N.Y.1974). To establish a court's personal jurisdiction over a foreign defendant under this theory, "a plaintiff must come forward with some definite evidentiary facts to connect the defendant with transactions occurring in New York." *Id.* at 322. A plaintiff must also "... alleg[e] facts warranting the inference that the foreign defendant was a member of the conspiracy and that the defendant 'had an awareness (a) of the effects of its activity in New

York and (b) that the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators.'" *Madanes,* 981 F.Supp. at 261. "Allegations of a conspiracy must be based upon direct or circumstantial evidence or reasonable inferences therefrom." *Optimum Worldwide,* 1996 WL 71500 at *4, 1996 U.S. Dist. LEXIS 1740, at *10 (citation omitted)[9].

In *Madanes,* the plaintiff brought suit in the Southern District Court of New York against several individual and corporate defendants, alleging violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) and asserting numerous statutory and common law claims under New York law. Two of the defendants filed a Rule 12(b)(2) motion to dismiss the complaint against them for lack of personal jurisdiction. At the time the motion was filed, the district court had authorized limited discovery on the issue of personal jurisdiction, but had yet to hold an evidentiary hearing. One of the defendants, a foreigner, requested the court to examine its personal jurisdiction over him based on the co-conspirator theory of personal jurisdiction. The plaintiff alleged in her complaint that the foreign defendant was aware of his part in an elaborate scheme which originated in New York with torts committed by the defendant's co-conspirators, and that the defendant benefitted from such torts. Based on these allegations, the court held that the plaintiff alleged facts sufficient to establish personal jurisdiction over the foreign defendant. *Id.* at 261.

In its second amended complaint, based upon the testimony of Plecas and Chandris, coupled with other evidence produced from the discovery taken thus far, such as correspondence, invoices, bank statements and business records, NationsBank has alleged that Chandris came to New York to

---

**9.** Under New York law, to plead a valid cause of action for conspiracy, the plaintiff must allege the primary tort and four additional elements: (i) a corrupt agreement between (or among) two (or more) persons; (ii) an overt act in furtherance of the agreement; (iii) the person's intentional participation in the plan; and (iv) damage or injury. *See Chrysler Capital Corp. v. Century Power Corp.,* 778 F.Supp. 1260, 1267 (S.D.N.Y.1991).

attend meetings with Plecas and others who have admitted committing many of the fraudulent acts alleged by Nations-Bank to conspire to engage and engage in various schemes, such as creating overstated invoices, and to defraud Nations-Bank and the Government of nearly $20 million, a substantial amount of which Chandris transferred to bank accounts he controlled. If this be believed, the benefit to Chandris is manifest; moreover Plecas testified to the benefit he received. Because the acts of a co-conspirator within New York may be attributed to an out-of-state defendant for the purposes of obtaining personal jurisdiction, *see, e.g. Grosser v. Commodity Exch., Inc.*, 639 F.Supp. 1293, 1308 (S.D.N.Y.1986), *aff'd*, 859 F.2d 148 (2d Cir.1988), and Plecas and others, who have named Chandris as the chief conspirator, have admitted to committing the fraudulent acts alleged by Nations-Bank, NationsBank has made the necessary *prima facie* showing with evidence that Chandris has sufficient minimum contacts with New York to allow this court to exercise personal jurisdiction over him without offending traditional notions of fair play and substantial justice. *See International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

■ NationsBank and the trustee also assert that Chandris is amenable to personal jurisdiction under C.P.L.R. § 302(a)(3), which confers jurisdiction over any defendant who commits a tort outside the state causing injury in the state, and either (i) regularly does or solicits business in New York, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state; or (ii) expects or reasonably should expect the tortious act to have consequences in the state and derives substantial revenue from interstate or international commerce. To determine jurisdiction under this subsection, courts generally apply a situs-of-injury test, which "asks them to locate the 'original event which caused the injury.' (citation omitted). This 'original event' is, however, generally distinguished not only from the initial tort but from the final economic injury and the felt consequences of the tort." *Bank Brussels*, at 791. "In the case of fraud or breach of fiduciary duty committed in another state, the critical question is thus where the first effect of the tort was located that ultimately produced the final economic injury." *Id.* at 792. In cases involving misrepresentations, courts have "often found that the situs of injury is New York when the original reliance or other first event causing the injury occurs in New York, even if the defendant has never sent any misrepresentations into the state." *Id.* at 792 (citing *Cleopatra Kohlique, Inc. v. New High Glass, Inc.*, 652 F.Supp. 1254 (E.D.N.Y.) and *Cavalier Label Co. v. Polytam, Ltd.*, 687 F.Supp. 872 (S.D.N.Y. 1988)).

■ Here, it is apparent from the evidence and deposition testimony that Chandris engaged in such tortious acts as falsifying invoices and creating fraudulent financial information in Greece, intending that they be relied upon by NationsBank and the Government. NationsBank failed to both (i) adequately aver in its amended complaint, even if construed in the light most favorable to it, with all doubts resolved in NationsBank's favor, and (ii) to produce any evidence that it had either originally relied upon these misrepresentations in New York or had suffered economic harm in New York by extending credit and/or advancing loan proceeds to MAPCO. Thus, NationsBank has failed to meet its burden of proof to establish jurisdiction under section 302(a)(3). The trustee, however, fares better.

■ In his complaint, the trustee averred that funds were fraudulently transferred from MAPCO to Chandris and/or Macoil and "guarantee fees" paid on a regular basis by MAPCO to Casablanca without fair consideration, all for Chandris' personal gain. The deposition testimony reflects that these transfers

were made, that they eventually made their way into bank accounts controlled by Chandris, and that MAPCO maintained an office in New York. Therefore, applying the situs-of-injury test, we must look at where the first effect of the tort was located that ultimately produced the final economic injury. The original events that caused the economic harm to MAPCO and eventually its bankruptcy estate were the fraudulent transfers of funds from MAPCO's coffers, thus, localizing MAPCO's injury in New York for section 302(a)(3) purposes.

Meeting the situs-of-injury test is, however, not enough to establish jurisdiction under section 302(a)(3). A plaintiff must also meet one of two additional sets of requirements: under subpart (i), that the defendant "regularly ... solicited business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered" in New York; or under subpart (ii), that the defendant "should [have] reasonably expected the [tortious] act to have consequences in the state and derived substantial revenue from interstate or international commerce." *See* C.P.L.R. § 302(a)(3). According to Plecas' deposition testimony, Macoil solicited business in the State of New York on a regular basis prior to September 1994, and both Chandris and Macoil before that time received the bulk of MAPCO's revenues. Chandris, by the very nature of his livelihood and the business operations of Macoil to supply oil to ships in the Eastern Hemisphere, also derived substantial revenue from international commerce. Plecas testified that MAPCO prepared the fraudulent invoices and the false borrowing base certificates which, according to her testimony, included, with Chandris' consent, false accounts receivable masked as legitimate accounts that allowed MAPCO to borrow a greater amount from NationsBank. Preparation of the fraudulent invoices and borrowing base certificates to

deceive NationsBank constitutes sufficient injurious contacts with NationsBank in New York to bring Chandris within the jurisdiction of this court. Moreover, Chandris, by participating in meetings in New York during Fleet Week to further the fraudulent schemes alleged in the trustee's complaint against him, combined with his own tortious acts, expected or should have expected that MAPCO and its creditors would be injured in this state. These contacts do not offend the traditional notices of fair play and substantial justice. Therefore, I conclude that Chandris' personal contacts with New York pursuant to section 302(a)(3) subject him to personal jurisdiction with respect to the trustee's complaint. Accordingly, the motion to dismiss the trustee's complaint for lack of personal jurisdiction is denied.

### V.

■ Having determined that I may exercise personal jurisdiction over Chandris under C.P.L.R. §§ 302(a)(2) and 302(a)(3), I deal now with Chandris' contention that the trustee did not properly effect service of process upon Chandris in Greece under the Hague Convention. According to Chandris, the returns of service provided by the Greek authorities indicate that a process server left process either at the outside door of the office building where Chandris works or at his former residence. As I discussed earlier in this decision, Bankruptcy Rule 7004, as it existed prior to the effective date of the 1996 amendments, directed the court to look to Federal Rule 4 and particularly to subsection 4(e) for service upon Chandris in Greece. Federal Rule 4(e) permitted process to be served "by means of the state's statutes providing for extraterritorial service on nonresidents." 2 Weinstein, NEW YORK CIVIL PRACTICE, ¶ 313.06 (1998). C.P.L.R. § 313 is the statute which provides for service of process on nonresident defendants[10]. "The salient exception to the rule

---

**10.** C.P.L.R. § 313 provides that "[a] person

domiciled in the state or subject to the juris-

that service outside New York must be made in the New York manner is created by the [Hague Convention]." McLaughlin, *Practice Commentaries on C.P.L.R. § 313*, reprinted in 7B C.P.L.R. § 313 (McKinney 1990). *Accord* Alexander, *Supplementary Practice Commentaries* on C.P.L.R. § 313, reprinted in 7B C.P.L.R. § 313 (McKinney 1999 Supp.). Federal Rule 4(i)(1), which is incorporated by reference into Bankruptcy Rule 7004(a), provides alternative methods of service when service beyond the United States is permitted either through a federal or state statute. They include:

> (A) in the manner prescribed by the law of the foreign country for service in that country in an action in any of its courts of general jurisdiction; or ... (C) upon an individual, by delivery to the individual personally, ...; or (D) by any form of mail, requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the party to be served;
> ...

"Service of process outside the United States or service made by a foreign plaintiff within the United States may be made pursuant to the provisions of the [Hague Convention], provided that the countries where service originates and is sought are signatories." 1 James Wm Moore *et al.*, MOORE'S FEDERAL PRACTICE, § 4.52[1][a] (3d ed.1999). "The Convention does not prescribe a standard [regarding the legal sufficiency of a formal delivery of documents], so we almost necessarily must refer to the internal law of the forum state. If the internal law of the forum state defines the applicable method of serving process as requiring the transmittal of documents abroad, then the Hague Service Convention applies." *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 700, 108 S.Ct. 2104, 100 L.Ed.2d 722 (1988). Compliance with the Convention is manda-

tory in all cases to which it applies. *Id.* at 704, 108 S.Ct. 2104. Applying New York law, "service effected outside the United States on a foreign corporation demands proper service under the constraints of the foreign domiciliary's law, unless that law is inconsistent with requirements of the Hague Convention Treaty." *Perfumer's Workshop v. Roure Bertrand du Pont*, 737 F.Supp. 785, 789 (S.D.N.Y.1990). The Hague Convention does not distinguish between foreign individuals and corporations. *See Melia v. Les Grands Chais De France*, 1990 WL 288625 at *5, 1990 U.S. Dist. LEXIS 18693 at *14 (D.R.I. Dec. 18, 1990). *See also Ackermann v. Levine*, 788 F.2d 830, 840 (2d Cir.1986) ("The old Federal Rule 4 was superceded by the Hague Convention and thus presumptively should not limit application of the Convention."). The United States and Greece are signatories to the Hague Convention, which authorizes several procedures for effectuating service of process, including, for example, service by direct mail (Article 10(a)), through the Central Authority (Articles 2–7), or through diplomatic or consular agents (Articles 8–9). *See Hague Convention*. Because Greece ratified the Hague Convention and did not make any declaration or limitation of its ratification, service must be made pursuant thereto. *See Ackermann*, 788 F.2d at 840.

It appears from the affidavit of the process server in Greece that process under the Hague Convention was served upon Chandris utilizing the Central Authority. Notwithstanding that Chandris asserts through his counsel that he was improperly served with process, there is no evidence to support the claim, only the motion signed by his counsel which does not purport to be made on personal knowledge. In his papers, Chandris promised that a declaration of Greek counsel con-

---

diction of the courts of the state under section 301 or 302, or his executor or administrator, may be served with the summons without the state, in the same manner as service is made within the state, by any person authorized to make service within the state who is a resi-

dent of the state or by any person authorized to make service by the laws of the state, territory, possession or country in which service is made or by any duly qualified attorney, solicitor, barrister, or equivalent in such jurisdiction."

cerning service of process would be served and filed in May 1998. It was not. Assertions in the motion signed by counsel, without factual support and not based upon counsel's personal knowledge of the facts, have no probative value. *See Selvaggi v. Grand Union*, 1997 WL 786943 at *3, 1997 U.S. Dist. LEXIS 20546 at *9 (S.D.N.Y. Dec. 22, 1997); *see also Commercial Union Ins. Co. v. Albert Pipe & Supply Co.*, 484 F.Supp. 1153, 1157 (S.D.N.Y.1980).

 "Once a defendant challenges the sufficiency of service of process, 'the burden of proof is on the plaintiff to show the adequacy of service.'" *Howard v. Klynveld Peat Marwick Goerdeler*, 977 F.Supp. 654, 658 (S.D.N.Y.1997). "Factual contentions regarding the manner in which service was executed may be made through affidavits, depositions and oral testimony." *Lachick v. McMonagle*, 1998 WL 800325 at *2, 1998 U.S. Dist. LEXIS 18529 at *4 (E.D.Pa. Nov. 16, 1998). "Conclusory statements that a defendant was properly served are insufficient to overcome a defendant's sworn affidavit that he was never served with process." *Howard v. Klynveld*, 977 F.Supp. at 658. *See also Rosquist v. New York University Medical Center*, 1998 WL 702295 at *15, 1998 U.S. Dist. LEXIS 15808 at *44 (S.D.N.Y. Oct. 7, 1998) (court referred motion to dismiss for an evidentiary hearing to resolve factual dispute regarding sufficiency of service following defendants' submission of affidavits, in opposition to the affidavits of the process server, denying that they were personally served.). *See generally* 5 Wright & Miller, Federal Practice and Procedure, § 1353 (2d ed.1990).

Here, the burden of proof would be on the trustee to demonstrate adequacy of service of process if Chandris had properly challenged the sufficiency of service. However, Chandris' attempt to contest the sufficiency of service of process falls short. Chandris does not dispute the propriety of service by sworn statement, either in the form of an affidavit or testimony, but by his counsel's statement, not based upon personal knowledge. Accordingly, his challenge to sufficiency of service of process fails.

## CONCLUSION

Chandris' motion to dismiss is denied as are the requests of NationsBank and the trustee for sanctions inasmuch as I cannot say that Chandris' motion was frivolous. (Indeed, I have agreed with Chandris as to certain challenges to personal jurisdiction.) The trustee is directed to SETTLE an order consistent with this decision. The parties are also directed to communicate with Chambers promptly to schedule a pretrial conference.