In re PAQUES, INC., Debtor.

Anheuser–Busch, Inc., Plaintiff,

v.

Paques, Inc.; Morrison Knudsen Corp.; Midwest Mechanical Contractors, Inc.; Boggs & Tatum, Inc.; U.S. Contractors, Inc.; Independent Constructors, Inc.; National Steel Erection Company; and the Official Committee of Unsecured Creditors, Defendants.

Morrison Knudsen Corp., Third–Party Plaintiff,

v.

Paques, B.V., Third–Party Defendant.

Official Committee of Unsecured Creditors for Paques, Inc., Plaintiff,

v.

Paques, B.V.; Paques—A.D.I., Inc.; Joseph Paques; and Thedo Blijdenstein, Defendants.

United States Bankruptcy Court, E.D. Pennsylvania.

Dec. 15, 2000.

Albert A. Ciardi, Jr., Philadelphia, PA, for Debtor.

Charles M. Golden, Edmond M. George, Philadelphia, PA, for Committee of Unsecured Creditors.

## MEMORANDUM

BRUCE I. FOX, Chief Judge.

Paques, B.V. is a third party defendant in bankruptcy litigation brought by Anheuser–Busch, Inc. ("A–B") against, *inter alia,* Morrison–Knudsen Corp. ("MK"). Paques, B.V. is also a defendant in bankruptcy litigation filed by the Official Committee of Unsecured Creditors of Paques, Inc.[1] In connection with both of these adversary proceedings, Paques, B.V. has filed a motion to dismiss as well as a motion for summary judgment.

These motions raise a number of issues. By agreement of the parties, however, I have been asked to focus initially on only one matter.

Paques, B.V. asserts under Fed. R.Bankr.P. 7012 (which incorporates Fed. R.Civ.P. 12(b), including Rule 12(b)(2)) and under Fed.R.Bankr.P. 7056 (which incorporates Fed.R.Civ.P. 56) that this court has no personal jurisdiction over this entity. The plaintiffs then sought the opportunity to take discovery on the jurisdictional challenge and for an evidentiary hearing to take place, which request was granted. *See, e.g., Renner v. Lanard Toys Ltd.,* 33 F.3d 277, 283 (3d Cir.1994).

As the jurisdictional question posed was viewed by the parties as the same in both adversary proceedings, the parties agreed that a combined evidentiary record would be made.[2] Based upon the evidence of-

---

1. After confirmation of the debtor's plan, all claims of the estate were transferred to a liquidating trust. Recently, the liquidating agent for this liquidating trust was substituted as the party plaintiff in the Committee's adversary proceeding. Nonetheless, to be consistent with the terminology used by the pleadings, this memorandum shall still refer to that plaintiff as the Committee.

2. There is a third adversary proceeding involving claims by Morrison Knudsen against Paques, B.V. and others. This lawsuit began in Texas state court before commencement of the bankruptcy case of Paques, Inc. and was later removed to this bankruptcy court and docketed as Adv. No. 00–0412. Prior to removal, defendant Paques, B.V. had sought dismissal for lack of personal jurisdiction.

It is unclear to me whether the parties anticipated that, in the course of resolving these two Rule 12(b)(2) motions, I would also resolve this earlier dismissal request. Their post-hearing submissions do not specifically address this removed complaint and the captions of these pleadings do not refer to this third lawsuit.

Therefore, I shall not consider at present the jurisdictional dispute existing in the removed litigation. Instead, I shall schedule a further hearing to consider the parties' views on the proper method to resolve it. In light of my conclusion that this bankruptcy court can obtain personal jurisdiction over Paques, B.V., and given that the relief sought against this entity in the removed lawsuit is quite similar to that asserted by Morrison Knudsen in its later third party complaint, these parties

fered, I make the following factual findings.

## I.

1. Paques, B.V. is a corporation established under the laws of the Netherlands. Ex. MK–1, at 118.

2. Paques, B.V. is the sole shareholder of the debtor, Paques, Inc. Ex. MK–3, at 14.

3. Paques, Inc., the debtor, was incorporated under the laws of Pennsylvania in 1990. Its offices were originally located at 1010 Artillery Point, West Chester, Pennsylvania. On May 17, 1990, the debtor signed a lease to rent 468 Thomas Jones Way, Suite 100, Exton, Pennsylvania. Ex. M–2. The lessor was also a Pennsylvania corporation. Ex. M–2, at 1. The debtor has remained in that location from 1990 until 2000.

4. The debtor's lease for the Exton realty was guaranteed by Paques, B.V.Ex. MK–2, at 23 (Ex. C, "Guaranty of Lease").

5. Among the officers and shareholders of Paques, B.V. is Mr. Johan H.J. Paques (referred to by the parties as Mr. "Jos" Paques). Mr. Paques is the president and chief operating officer of Paques, B.V.Ex. C–4 (resolution of March 25, 1998).

6. The debtor licensed technology from Paques, B.V. from 1990 until 1999. Ex. MK–1, at 69–75, 84. After the licensing agreement with Paques, B.V. was terminated, Mr. Jos Paques and Mr. Blijdenstein decided that the debtor should not be liquidated; rather it should remain in business to service "existing projects" and as "a marketing outlet for other Nupaq technologies in the United States, which were not covered by the license agreement with Paques–ADI." Ex. MK–3, at 38–39.

7. Mr. Jos Paques is also a director of the debtor. Mr. Thedo Blijdenstein is another director of the debtor who is also an officer of Paques, B.V.Ex. C–4.

8. Mr. Blijdenstein provided financial services to the debtor. At that time, he was in the employ of Paques, B.V.N.T., Sept. 11, 2000, at 141.

9. Mr. Jappa Hettinga was another employee of Paques, B.V. who was employed for a period of time by the debtor as a project manager. During the period of time he was employed by the debtor, Mr. Hettinga also received certain benefits from Paques, B.V. including the use of a credit card. N.T., Sept. 11, 2000, at 59; Ex. MK–16. After his employment with the debtor was concluded, he returned to the employ of Paques, B.V.Ex. MK–3, at 54–55; N.T., Sept. 11, 2000, at 145.

10. Mr. Martin Tielbaard is a former employee of Paques, B.V. In 1993, he became an employee of the debtor. In 1999, he was chosen by Mr. Jos Paques to become the president of the debtor. N.T., Sept. 11, 2000, at 81.

11. During various times, the president of the debtor was hired or fired by Mr. Jos Paques. Ex. *See* MK–3, at 15–16; N.T., Sept. 11, 2000, at 119–120. Mr. Paques also designated a Paques, B.V. employee, Mr. Wim Hassing, to serve as president of the debtor on an interim basis. Ex. BV–3 (Tielbaard deposition, at 102–04).

12. Mr. Jos Paques traveled to the United States and in so doing sometimes sought contracts for other subsidiaries of Paques, B.V. *See* N.T., Sept. 11, 2000 at 163. In addition, he attended a meeting in St. Louis on February 4, 1999 which was scheduled to discuss disputes which had

---

can also consider whether the jurisdictional challenge in the earlier litigation has any con-

tinuing independent significance to them.

arisen in connection with the A–B Houston water treatment construction project. Ex. MK–36.

13. Ms. Kathy Rosciolo is a former employee of the debtor who later returned, on a part-time basis, to work on the financial records of the debtor. N.T., Sept. 11, 2000 at 36. When she returned to the debtor's offices to provide such services, she was (at her request) paid directly by Paques, B.V. *Id.*, at 36, 43, 125.

14. Paques, B.V. is the 30% interest holder in a joint venture known as Paques ADI, Inc. Ex. MK–4, at 3. The remaining interest holder is an entity known as ADI Capital, Inc. Ex. MK–1, at 117. Paques ADI holds a license to use technology from Paques Water Systems, B.V., a wholly owned subsidiary of Paques, B.V.Ex. MK–4, at 3. Paques ADI is a Delaware corporation with corporate offices at 389 Main Street, Salem, New Hampshire and 486 Thomas Jones Way, Exton, Pennsylvania. Ex. MK–4, at 2–3, (unpaginated) 6.

15. The joint venture agreement between Paques, B.V. and ADI Capital, Inc., dated February 1, 1999, Ex. K–1, at 117–142, was signed by Mr. Jos Paques and others at 468 Thomas Jones Way, Suite 100, Exton, Pennsylvania. N.T., Sept. 11, 2000, at 149–50.

16. The Paques ADI, Inc. joint venture agreement provides that the office of "Paques" is located in Exton, Pennsylvania. Ex. MK–1, at 123, ¶ 3.5. The only "Paques" company which is a party to this agreement is Paques, B.V.

17. The website for Paques, B.V. formerly referred to the Exton, PA office as an office of Paques, B.V. *See* N.T., Feb. 7, 2000 (transcript of testimony of Mr. Tiel-

baard regarding request for Rule 2004 examination).

18. The website for Paques, B.V. describes that company as follows:

We are a medium-sized company operating on an international basis. Our head office is situated in Balk in the Netherlands and currently employs two hundred persons. An extensive web of professional license partners in more than 20 countries markets our knowledge and experience in the field of effective treatment techniques world-wide. In addition to this, we have joint ventures in the USA and China.

Ex. MK–5.[3]

19. Mr. Martin Tielbaard, while president of the debtor, reviewed certain aspects of the joint venture proposal between AD I Capital, Inc. and Paques, B.V. N.T., Sept. 11, 2000, at 96, 116, 147–49. After the agreement was signed, and while still an officer of the debtor, Mr. Tielbaard became vice-president of Paques ADI, Inc. *See* Ex. MK–4, at (unpaginated) 6.

20. Before Mr. Tielbaard, the debtor's president, approved its voluntary chapter 11 bankruptcy filing on August 5, 1999, he sought approval from Mr. Jos Paques. N.T., Sept. 11, 2000, at 152–53.

21. As the sole shareholder of the debtor, Paques, B.V. was aware of and did not oppose the debtor's voluntary bankruptcy filing. Mr. Blijdenstein and Mr. Paques knew of and approved such a filing. N.T., Sept. 11, 2000 at 152–53. Counsel for Paques, B.V. referred the debtor's president to an attorney ultimately retained by the debtor for bankruptcy representation. N.T., Sept. 11, 2000 at 84–85. Thereafter, on November 12, 1999, Paques, B.V.'s at-

---

**3.** A document found in the records of A–B connected with the bid package submitted to A–B by the debtor stated in part: "The U.S. office of Paques and its headquarters office in Holland have attached the absolute highest priority to winning this project." Ex. MK–18, at AB016284.

torneys, Salla & Armstrong, LLP., filed an entry of appearance in this chapter 11 case "on behalf of creditor Paques, B.V." *See* Docket Entry # 61.[4]

22. There were inter-company debits and credits between the debtor and Paques, B.V. in the financial records of the debtor. *See* Exs. MK–9, MK–10. Within one year prior to the debtor's bankruptcy filing, the debtor transferred more than $1 million to Paques, B.V. *See* Ex. MK–6, at 630,632; Ex. MK–1, at 50–52; N.T., Sept. 11, 2000, at 40–41. The debtor listed in its bankruptcy schedules that it still owed Paques, B.V. about $800,000.00. N.T., Sept. 11, 2000 at 70, 156. This debt was scheduled as uncontested based upon the financial information compiled by Mr. Blijdenstein and Ms. Rosciolo. N.T., Sept. 11, 2000, at 157. As a result of this filing, Paques, B.V. is a creditor of the debtor in this bankruptcy case who need not file any proof of claim. Fed.R.Bankr.P. 3003(a).

23. Paques, B.V. has an agreement with "a Chicago based company ... for marketing of sales of technology for the oil industry in a worldwide market." Ex. MK–3, at 8.

24. Before the debtor was incorporated, Paques, B.V. was involved with two waste-water treatment projects in the United States in 1988. N.T., Sept. 11, 2000, at 139.

25. Before working on the Anheuser–Busch project (which work began in 1997), the debtor was involved in approximately 20 projects in the United States since its formation. N.T., Sept. 11, 2000, at 136. On a number of those projects, the debtor would purchase special equipment from Paques, B.V. and resell that equipment to the project owner. N.T., Sept. 11, 2000, at 136. If a reactor was involved, sometimes Paques, B.V. would oversee its installation. N.T., Sept. 11, 2000, at 137. Paques, B.V. also gave technical advice to the debtor on various waste-water treatment problems. N.T., Sept. 11, 2000, at 137. To the extent the debtor used waste-water treatment technology in these projects, such technology was licensed from Paques, B.V. or a wholly-owned subsidiary. Before 1998, the debtor also did some marketing for another subsidiary of Paques, B.V. N.T., Sept. 11, 2000 at 162.

26. Paques, B.V. provided goods and services on a construction project in Houston, Texas which commenced in 1997 (the A–B project) on which the debtor served as general contractor. The approximate value of those goods and services was $694,432.00 Ex. MK–38. Among the services provided was the design of a waste-water treatment reactor used in the plant, plus engineering of the scrubbers. N.T., Sept. 11, 2000 at 132. Mr. Tielbaard described Paques, B.V.'s connection to this project as a "subcontractor to Paques, Inc." N.T., Sept. 11, 2000 at 57.

27. Paques, B.V. authorized one of its employees, Mr. Jappa Hettinga, to become an employee of the debtor who would serve as a project engineer on the Houston, Texas project. After serving as project engineer, Mr. Hettinga returned to Paques, B.V. as an employee. *See* Ex. MK–30.

28. In the bid proposal submitted by the debtor to A–B in connection with the Houston project, dated July 22, 1997, the proposal stated:

---

4. I take judicial notice, under Fed.R.Evid. 201 (incorporated into bankruptcy cases by Bankr.R. 9017), of the docket entries of this case. *See Maritime Elec. Co., Inc. v. United Jersey Bank,* 959 F.2d 1194, 1200 n. 3 (3d Cir.1991); *Levine v. Egidi,* 1993 WL 69146, at *2 (N.D.Ill.1993); *In re Paolino,* 1991 WL 284107, at *12 n. 19 (Bankr.E.D.Pa.1991); *see generally In re Indian Palms Associates, Ltd.,* 61 F.3d 197 (3d Cir.1995).

While this proposal has been primarily prepared by Paques, Inc. we would like to emphasize at the onset that Paques B.V. has and will be intimately involved with this project. As we will explain later in some detail, Paques B.V. normally executes projects on a design/build basis. For the Houston project, we would take an integrated approach under which project management activities carried out in the Exton office would be overseen by Paques B.V. and carried out according to their proven procedures.

Ex. MK–18, at (paginated) 2; *see also* Ex. MK–19, at 2; MK–21 (project flowchart); MK–30 (letter of November 10, 1998).

29. Anheuser Busch sought to purchase a "turnkey" facility to treat waste water from its brewery in Houston, Texas. N.T., Sept. 29, 2000 at 5. A–B sought a bid from the debtor. The debtor had not built any waste-water treatment plants before and MK was solicited by the debtor to help prepare the bid proposal and later, to help build the plant. N.T., Sept. 29, 2000 at 8–9.

30. The debtor provided a flow diagram for the facility while MK built the structure to house the equipment used to treat waste water: an anaerobic biological process by which bacteria eat the waste. N.T., Sept. 29, 2000 at 9.

31. While the Houston project was under construction, various disputes arose among the project owner, the debtor and MK. On March 26, 1998, Mr. Jos Paques sent a letter to an employee of MK and an identical letter to an employee of A–B, under the letterhead of "Paques Environmental Technology"[5] and signed both letters as president of Paques, B.V. The letters stated in relevant part:

We write to inform you that William A. Bonkoski is no longer with our company. In the near future, we will inform you about the appointment of a new president. In the meantime, Mr. Wim Hassing, Managing Director of Paques Water Systems B.V., is in charge of Paques, Inc. We assure you that our commitment to the North American market continues.

The importance of this market for our company forced us to make this decision.

Our Exton, PA office will continue to provide Paques Water Systems and Bio Systems services.

Exs. MK–25; MK–26.

## II.

I reach the following legal conclusions:

1. The plaintiffs have the evidentiary burden to demonstrate that personal jurisdiction exists over defendant Paques, B.V. in this forum.

2. In order for this court to exercise personal jurisdiction over this defendant, such exercise must be consistent with the due process clause of the Fifth Amendment to the United States Constitution.

3. By virtue of Fed.R.Bankr.P. 7004(f), bankruptcy courts may exercise personal jurisdiction over foreign defendants who have sufficient contacts with the United States.

4. The plaintiffs met their burden to show that Paques, B.V. had sufficient contacts with the United States to permit the exercise of personal jurisdiction without violating due process.

5. Defendant Paques, B.V. has the evidentiary burden to demonstrate that the exercise of this jurisdiction would not be fair or reasonable.

B.V.Ex. BV–3, at 14–17.

**5.** This name is sometimes used by Paques,

6. The defendant did not meet this evidentiary burden.

## III.

In its amended third party complaint, Morrison Knudsen Corp. alleges that the debtor was engaged, prior to its bankruptcy filing, as a general contractor by Anheuser–Busch, Inc. to construct a particular type of waste-water treatment facility in Houston, Texas. It is further averred that the debtor thereafter engaged MK as its principal subcontractor on this construction project. There were many other subcontractors hired either by the debtor or by MK to perform various services or to provide needed goods.

At the time the debtor, Paques, Inc., entered into its construction contract with A–B, and at all times thereafter, its sole shareholder was an entity known as Paques, B.V. This latter corporate entity exists under the laws of the Netherlands and has developed water treatment processes. One or more of these processes had been licensed to the debtor corporation and were to be used in the A–B treatment plant.

A–B asserted in its complaint filed in this bankruptcy court that the debtor did not comply with the terms of its contract, both by failing to complete the construction work properly and by failing to pay all of its subcontractors and suppliers. Based upon these alleged contractual breaches, A–B has withheld about $1.5 million that would otherwise be due the debtor under its construction contract. (MK maintains that A–B owes the debtor even more money.) In addition, various subcontractors have asserted mechanics lien claims against A–B under Texas law: MK; Boggs & Tatum, Inc.; Independent Constructors, Inc.; National Steel Erection Co.; Midwest Mechanical Contractors, Inc.; and U.S. Contractors, Inc.

The MK amended third party complaint asserts various claims against Paques, B.V. The third party defendant allegedly is liable to MK as the "alter ego" of the debtor, general contractor. Amended Third Party Complaint, ¶ 13. MK also contends that Paques, B.V. is liable for "breach of implied warranty of specification," arising from "plans and specifications" which the former supplied to the latter as part of the construction work. *Id.*, ¶ 15. In addition, MK alleges that Paques, B.V. is liable for "negligent misrepresentation" in providing information to MK "in preparing its bid and performing its work under the" subcontract. *Id.*, ¶ 21. Finally, MK maintains that Paques, B.V. is liable to it under a theory of "quantum meruit." *Id.*, at ¶¶ 29–30.

Thus, all of the claims raised by MK in its amended third party complaint against Paques, B.V. arise from MK's subcontractor work on the Houston project. Two of the four claims asserted expressly aver that Paques, B.V. acted improperly in connection with services which this third-party defendant allegedly provided in connection with that construction project. The other two of the claims are derived from the alleged connection between Paques, Inc. and its parent company, Paques, B.V.

The amended complaint filed by the Official Creditors Committee does not focus upon the Houston water treatment construction project for A–B as the basis for its claims. Instead, the Committee avers that Paques, B.V. provided an exclusive license of water treatment technology to its subsidiary, Paques, Inc. Amended Complaint, ¶ 52. This license was issued allegedly "so that Paques, B.V. technology could be marketed in North America and the United States by the debtor [Paques, Inc]." *Id.*, ¶ 53. The Committee also maintains that Paques, B.V. later "improperly transferred" this license from the debtor

to a newly formed entity: Paques ADI, Inc. *Id.*, at ¶ 54.

As a result, Paques, B.V. is alleged by the Committee to have breached its licensing agreement with the debtor, *id*, at ¶ 80; moreover, as the debtor received no consideration for this license transfer, the conveyance of the license was purportedly "fraudulent," *id.*, ¶ 119, giving rise to a second claim for damages.

Independent of the licensing agreement between the debtor and its parent company, the amended complaint contends that Paques, B.V. improperly caused the debtor to transfer millions of dollars to it. *Id.*, at 122. This allegedly improper transfer gives rise to an additional claim for fraudulent conveyance, as well as one for conversion, plus another claim for "unjust enrichment." *Id.*, at ¶¶ 125, 128, 161. Moreover, if the asserted transfer of funds from subsidiary to parent was based upon a valid antecedent debt, then the Committee maintains that the transfer was preferential. *Id.*, at ¶¶ 150–155.

Still focusing upon the allegedly improper transfer of the license as well as the aforementioned funds, the Committee's amended complaint contends that Paques, B.V. was involved in a civil conspiracy with others to harm the debtor by divesting it of its assets. *Id.*, at ¶¶ 138–141. Finally, as MK did, the Committee maintains that

Paques, B.V. is the alter ego of the debtor and so should be liable for various (unspecified) damages. *Id.*, at ¶¶ 96–111.

Thus, the Committee's amended complaint raises claims against this defendant based upon transfers of the debtor's assets to Paques, B.V. (or to some entity at the behest of this defendant). In addition, relief is also sought due to the asserted "alter ego" status of the parent corporation with the debtor subsidiary.

## IV.

### A.

■ A challenge to a federal court's *in personam* jurisdiction may consist of two components.[6] First, a court may focus upon a defendant's amenability to personal service of the complaint: *i.e.*, "whether the procedural requirement of service of the summons has been satisfied." *Omni Capital Intern., Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987). The second component concerns the constitutional authority of the federal forum to enforce the procedure by which service has been or will be perfected.

■ Of course, a defendant may waive any *in personam* jurisdictional challenge it may have; or it may consent to the exercise of such jurisdiction. *See id.*, at 104,

---

6. In diversity cases, there may be a third component: *viz.*, whether the state long-arm statute permits the exercise of jurisdiction over the defendant. *See IMO Industries, Inc. v. Kiekert AG*, 155 F.3d 254, 258–59 (3d Cir. 1998). These proceedings arise from the provision of bankruptcy jurisdiction under 28 U.S.C. § 1334, rather than the diversity statute. Moreover, when a state "long-arm statute permits the exercise of personal jurisdiction to the fullest limits of due process" this third component adds no further analysis to the constitutional limitation. *Id.*, at 259. Were Pennsylvania's long-arm statute to apply here—and it does not—this statutory provision was intended to extend as far as due process will permit. 42 Pa.C.S.A. § 5322(b) ("In addition to the provisions of subsection (a) the jurisdiction of the tribunals of this Commonwealth shall extend to all persons who are not within the scope of section 5301 (relating to persons) to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States"); *accord Van Buskirk v. Carey Canadian Mines, Ltd.*, 760 F.2d 481, 490 (3d Cir. 1985).

108 S.Ct. 404. In bankruptcy cases it has been held, for example, that a creditor who files a proof of claim in a case thereby consents to the exercise of personal jurisdiction in bankruptcy litigation involving that creditor. *See, e.g., In re PNP Holdings Corp.*, 99 F.3d 910 (9th Cir.1996) ("Tucker [a Canadian corporation] consented to the bankruptcy court's exercise of personal jurisdiction by filing a proof of claim"); *In re American Export Group Intern. Services, Inc.*, 167 B.R. 311, 314 (Bankr.D.D.C.1994). It has been also held that a foreign party who participates in a bankruptcy case through pleadings filed has also consented to jurisdiction. *See In re Nakash*, 190 B.R. 763, 767–68 (Bankr. S.D.N.Y.1996).

The parties here have assumed, as therefore shall I, that Paques, B.V. did not consent to jurisdiction in these proceedings.[7] Also not addressed in the parties' post-hearing submissions, nor at the hearing itself, were any issues regarding the procedure by which this defendant was served. While there may or may not be some contention regarding the plaintiffs' method of service, such a challenge has not been presented at this point.

**7.** In chapter 11 cases, Bankruptcy Rule 3003(b)(1) provides that a creditor need not file a proof of claim whenever the chapter 11 debtor files a schedule of claims which includes that creditor's claim in an undisputed, non-contingent and liquidated amount. *See, e.g., In re Hooker Investments, Inc.*, 937 F.2d 833, 835 (2nd Cir.1991). The debtor did so schedule a claim in favor of Paques, B.V. Thus, this defendant is a creditor in this case who may be entitled to a distribution from the estate.

All the parties implicitly accept that as this creditor did not file a proof of claim—rather, its claim was deemed allowed due to the action taken by its wholly owned subsidiary—it has not consented to the exercise of personal jurisdiction. I shall make the same assumption.

The only issue addressed by the evidence offered at the hearing and in the parties' subsequent memoranda concerns the constitutional authority for the assertion of jurisdiction over Paques, B.V. by this bankruptcy court. Accordingly, it is that question alone which I shall determine. In resolving this dispute, I recognize that the plaintiffs have the burden to demonstrate that personal jurisdiction exists. *See, e.g., BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.*, 229 F.3d 254, 259 (3d Cir.2000).[8]

### B.

The constitutional limitations on a federal forum's use of a long-arm statute to compel a foreign defendant to appear in the forum is intended to preserve the liberty of the defendant.

> The purpose of this test [*i.e.*, the constitutional standard], of course, is to protect a defendant from the travail of defending in a distant forum, unless the defendant's contacts with the forum make it just to force him to defend there. As we explained in *Woodson, supra*, the defendant's contacts should be such that "he should reasonably anticipate being haled" into the forum.

In addition, as will be discussed below, this defendant has filed an entry of appearance in this bankruptcy case. Since the parties do not argue that such a filing constitutes a consent to jurisdiction, I will not reach that issue. I do, however, consider such an entry of appearance in the context of the defendant's minimum contacts.

**8.** When an evidentiary hearing is held on the jurisdictional question, the plaintiff must prevail under the preponderance of evidence standard. *See, e.g., A.I. Trade Finance, Inc. v. Petra Bank*, 989 F.2d 76, 79 (2d Cir.1993); *In re Schwinn Bicycle Co.*, 192 B.R. 461, 469 (Bankr.N.D.Ill.1996) *In re Levant Line, S.A.*, 166 B.R. 221, 228 (Bankr.S.D.N.Y.1994).

444 U.S., at 297, 100 S.Ct., at 567. In *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702–703, and n. 10, 102 S.Ct. 2099, 72 L.Ed.2d 492 ... we explained that the requirement that a court have personal jurisdiction comes from the Due Process Clause's protection of the defendant's personal liberty interest, and said that the requirement "represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty."

*Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 807, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985).

▊ Just recently, the Third Circuit Court of Appeals canvassed recent Supreme Court decisions and summarized the evolving principles regarding due process as it relates to federal *in personam* jurisdiction:

> The constitutional touchstone of due process analysis is "whether the defendant purposefully established 'minimum contacts' in the forum." *Burger King Corp.,* 471 U.S. at 474, 105 S.Ct. 2174. "[T]he foreseeability that is critical to due process analysis ... is that the defendant's conduct and connection with the forum ... are such that he should reasonably anticipate being haled into court there." *Id.* (quoting *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 295, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). "It is essential in each case that there be some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum ..., thus invoking the benefits and protections of its laws." *Id.* at 475, 105 S.Ct. 2174 (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). "This 'purposeful availment' requirement ensures that a defendant will not be haled

into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts...." *Id.* (quoting *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)).

*BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.,* 229 F.3d at 259.

▊ The "minimum contacts" concept as the "touchstone" of due process under the Fourteenth Amendment was initially enunciated in *International Shoe Co. v. State of Washington Office of Unemployment Compensation and Placement,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The Court has since elaborated on that concept so that two types of minimum contacts are now recognized:

> In *International Shoe v. Washington,* ... the Court set forth a two-track approach to determine the constitutional limits on long-arm jurisdiction. Different jurisdictional tests apply where the cause of action arises from a non-resident defendant's specific forum-related acts and where the cause of action arises from non-forum acts, but the defendant has an ongoing connection with the forum. The latter exercise of jurisdiction is termed "general jurisdiction," *see e.g., Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 1872 n. 9, 80 L.Ed.2d 404 (1984), while the former is characterized as "specific jurisdiction." *Id.,* 104 S.Ct. at 1872 n. 8; *see generally, Dollar Savings Bank v. First Security Bank of Utah,* 746 F.2d 208, 211–15 (3d Cir.1984); Von Mehren & Troutman, *Jurisdiction to Adjudicate: A Suggested Analysis,* 79 Harv.L.Rev. 1136 (1966).

*Van Buskirk v. Carey Canadian Mines, Ltd.,* 760 F.2d 481, 490 (3d Cir.1985); *see also IMO Industries, Inc. v. Kiekert AG,* 155 F.3d 254, 260 (3d Cir.1998).

Thus, "if the plaintiff's claim does not arise out of the defendant's contacts with the forum, the court is said to exercise 'general jurisdiction.'" *IMO Industries, Inc. v. Kiekert AG*, 155 F.3d at 259 n. 2. Such contacts must be "continuous and systematic." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). If, however, "the plaintiff's cause of action is related to or arises out of the defendant's contacts with the forum, the court is said to exercise 'specific jurisdiction.'" *Id.*, at 259.[9] The minimum contacts giving rise to specific jurisdiction exist where the defendant has "purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or [are] related to' those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

■ In addition to demonstrating "minimum contacts," the federal court should also evaluate whether the exercise of personal jurisdiction is fair and reasonable under the circumstances:

> Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with "fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S., at 320 [66 S.Ct. 154].... Thus courts in "appropriate case[s]" may evaluate "the burden on the defendant," "the forum State's in-

terest in adjudicating the dispute," "the plaintiff's interest in obtaining convenient and effective relief," "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and the "shared interest of the several States in furthering fundamental substantive social policies." *World–Wide Volkswagen Corp. v. Woodson, supra*, 444 U.S., at 292 [100 S.Ct. 559].... These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required.... On the other hand, where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable. Most such considerations usually may be accommodated through means short of finding jurisdiction unconstitutional. For example, the potential clash of the forum's law with the "fundamental substantive social policies" of another State may be accommodated through application of the forum's choice-of-law rules. Similarly, a defendant claiming substantial inconvenience may seek a change of venue. Nevertheless, minimum requirements inherent in the concept of "fair play and substantial justice" may defeat the reasonableness of jurisdiction even if the defendant has purposefully engaged in forum activities.

9. What appears to be a subset of the "specific jurisdiction" type of "minimum contacts" sufficient to establish a constitutional basis for jurisdiction over a defendant was enunciated in *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). When a defendant commits an intentional tort outside of the forum, but the plaintiff feels "the brunt of

the harm caused by that tort in the forum" and the defendant "must have expressly aimed his tortious conduct at the forum," then personal jurisdiction over the defendant in the forum is constitutionally permissible. *IMO Industries, Inc. v. Kiekert AG*, 155 F.3d at 256.

**628**

*Burger King Corp. v. Rudzewicz,* 471 U.S., at 476–78, 105 S.Ct. 2174 (footnotes and citations omitted).

■ Where the defendant is not the resident of another state but of a foreign country, the factors included in the fairness analysis should recognize that the defendant is being compelled to submit to a foreign legal system. *Asahi Metal Indus. Co., Ltd. v. Superior Court of California, Solano County,* 480 U.S. 102, 114, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

As will be discussed below, I appreciate that in these two adversary proceedings I am not considering the constitutional limitations of a state long-arm statute. When state law is analyzed for compliance with due process, the Fourteenth Amendment is implicated. In general, Supreme Court jurisprudence on the constitutional limitations of *in personam* jurisdiction is premised on the Fourteenth Amendment.

■ When a federal long-arm provision is applied, its constitutional limits are defined by the due process clause of the Fifth Amendment, not the Fourteenth. *See, e.g., In re Chase & Sanborn Corp.,* 835 F.2d 1341, 1344 (11th Cir.1988), *rev'd on other grds. sub nom. Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989). Furthermore, the constitutional test concerns "minimum contacts" with the United States, rather than with a particular state. *See, e.g., BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.,* 229 F.3d at 259 (construing Fed.R.Civ.P. 4(k)(2)); *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.,* 119 F.3d 935, 946–47 (11th Cir.1997) (construing 18 U.S.C. § 1965(d)). Most courts, nonetheless, have applied the same principles enunciated in connection with the due process clause of the Fourteenth Amendment when determining whether minimum contacts with the United States are present. *See, e.g., BP*

*Chemicals Ltd. v. Formosa Chemical & Fibre Corp.; Republic of Panama v. BCCI Holdings (Luxembourg) S.A.; Max Daetwyler Corp. v. R. Meyer,* 762 F.2d 290, 293 (3d Cir.) ("Because this action arises under the patent laws, the due process clause of the fifth amendment guides the constitutional branch of the jurisdictional inquiry.... The fifth amendment has been construed to impose a general fairness test incorporating *International Shoe's* requirement that 'certain minimum contacts' exist between the non-resident defendant and the forum such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' "), *cert. denied,* 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985); *In re Xacur,* 219 B.R. 956 (Bankr.S.D.Texas 1998); *see also* Silberman, "Far Reaching Changes: The Future Expansion of Personal Jurisdiction Over Foreign Defendants Under the Federal Rules of Bankruptcy Procedure," 11 *Bankr.Dev.J.* 819, 828–29 (1995) ("While the due process concerns of the Fourteenth Amendment do not apply to the federal government, they are generally thought to be the same as those associated with the Fifth Amendment. Therefore, an examination of the Supreme Court's treatment of the Fourteenth Amendment can be helpful in determining the restrictions that accompany the Fifth Amendment") (footnote omitted).

■ When the Fifth Amendment rather than the Fourteenth is germane, "courts should balance the burdens imposed upon the [foreign] defendant against the federal interests involved in the litigation.... As in other due process inquiries, the balancing seeks to determine if the infringement on individual liberty has been justified sufficiently by reference to important governmental interests." *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.,* 119 F.3d at 946; *see* Silberman, "Far

Reaching Changes: The Future Expansion of Personal Jurisdiction Over Foreign Defendants Under the Federal Rules of Bankruptcy Procedure," 11 *Bankr.Dev.J.* at 829 ("Therefore, under the Fifth Amendment, a federal court in determining the "reasonableness" of personal jurisdiction over foreign defendants must focus on three factors: (1) the interests of the plaintiff, (2) the interests of the United States, and (3) the burdens on the defendant").

In determining the appropriate balance, the defendant has the burden to establish that the assertion of jurisdiction would be unreasonable. *See, e.g., Burger King Corp. v. Rudzewicz,* 471 U.S. at 478, 105 S.Ct. 2174; *In re Banco Latino Intern.,* 176 B.R. 278, 284 (Bankr.S.D.Fla.1994).

## V.

■■■ Before applying the principles just outlined, I must first determine which long-arm provision is applicable to this dispute. Paques, B.V. contends that

> MK will receive no benefit from the nationwide service of process provisions of the Federal Rules of Bankruptcy Procedure, and thus cannot argue that this Court should analyze BV's contacts with the United States as a whole instead of just Pennsylvania. The nationwide service of process provisions of Fed. R.Bankr.P. 7004(b) do not apply to this case because service was not and cannot be effected in the United States.

Paques, B.V.'s Brief in Support of Motion to Dismiss, at 7–8. I find this argument to overlook a recent amendment to the national bankruptcy rules and thus is rendered unpersuasive.

## A.

The nationwide service of process rule to which Paques, B.V. refers is found in Fed. R.Bankr.P. 7004(d) (not, as defendant suggests, in Rule 7004(b)). Rule 7004(d)—which applies to all bankruptcy adversary proceedings, *see* Fed.R.Bankr.P. 7001—states: "The summons and complaint and all other process except a subpoena may be served anywhere in the United States."

The principle that Congress has the power to provide for nationwide service of process in bankruptcy cases has long been accepted. *See Continental Illinois Nat. Bank & Trust Co. of Chicago v. Chicago, R.I. & P.Ry.Co.,* 294 U.S. 648, 683, 55 S.Ct. 595, 79 L.Ed. 1110 (1935) ("Congress may authorize the civil process of a federal district court to be served upon persons in any other district"). Rule 7004(d), which was enacted pursuant to the Bankruptcy Rules Enabling Act, 28 U.S.C. § 2075, and thus authorized by Congress,[10] has been upheld as a constitutional exercise of federal power. *See, e.g., In re Federal Fountain, Inc.,* 165 F.3d 600 (8th Cir.1999); *Diamond Mortgage Corp. of Illinois v. Sugar,* 913 F.2d 1233 (7th Cir.1990), *cert. denied,* 498 U.S. 1089, 111 S.Ct. 968, 112 L.Ed.2d 1054 (1991); *see also Hogue v. Milodon Engineering, Inc.,* 736 F.2d 989 (4th Cir.1984) (upholding former Rule 704(f), the predecessor to Rule 7004(d)). As explained by the Seventh Circuit:

> Generally, a court's assertion of personal jurisdiction must comport with "traditional notions of fair play and substantial justice" if it is to satisfy the Due Process Clause of the Constitution. *International Shoe Co. v. Washington,* 326 U.S.

---

**10.** *See* 28 U.S.C. § 2074(a); Silberman, "Far Reaching Changes: The Future Expansion of Personal Jurisdiction Over Foreign Defendants Under the Federal Rules of Bankruptcy Procedure," 11 *Bankr.Dev.J.* at 834–35 (de-scribing the extensive process by which federal rules of bankruptcy procedure are enacted, the last step of which involves congressional review).

310, 316, [66 S.Ct. 154, 90 L.Ed. 95] (1945). . . . [A]nd these minimum contacts must be grounded in " 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " . . . .

We believe, however, that the Barron and Jaffe Attorneys' contacts with the State of Illinois are, for our purposes, simply irrelevant. We have already established that district courts exercise original subject matter jurisdiction over non-core matters pursuant to 28 U.S.C.A. section 1334 (West Supp.1990). Since section 1334 provides federal question jurisdiction, the sovereign exercising its authority over the Barron and Jaffe Attorneys is the United States, not the State of Illinois. Hence, whether there exist sufficient minimum contacts between the attorneys and the State of Illinois has no bearing upon whether the United States may exercise its power over the attorneys pursuant to its federal question jurisdiction. Certainly, the attorneys have sufficient contacts with the United States to be subject to the district court's in personam jurisdiction.

*Diamond Mortgage Corp. of Illinois v. Sugar*, 913 F.2d at 1244 (citations omitted); *accord Brown ex rel. FoxMeyer Drug Co. v. C.D. Smith Drug Co.*, 1999 WL 709992, *5 (D.Del.1999).

Before 1996, courts were divided over whether plaintiffs in bankruptcy litigation needed to demonstrate that foreign defendants (as opposed to U.S. defendants) had the requisite "minimum contacts" with the United States or with the bankruptcy forum state in order to justify *in personam* jurisdiction. Some, based upon Rule 7004(d), concluded that the relevant contacts were with the United States. *See In re Chase & Sanborn Corp.*, 835 F.2d at 1344; *In re Donald G. Atteberry, DVM, P.A.*, 159 B.R. 1, 5 (D.Kan.1993); *In re Ace Pecan Co., Inc.*, 143 B.R. 696, 701 (Bankr. N.D.Ill.1992).

Others noted that then Fed.R.Bankr.P. 7004(e)—"Service on Debtor and Others in Foreign Country"—rather than Rule 7004(d) governed the exercise of service of process upon foreign defendants. They concluded that Rule 7004(d) did not qualify as an applicable "federal law" involving foreign defendants under Fed.R.Civ.P. 4; accordingly, they held that state long-arm statutes were relevant to obtain jurisdiction over a foreign defendant. *See, e.g., In re Levant Line, S.A.*, 166 B.R. 221, 230 (Bankr.S.D.N.Y.1994); *In re All American of Ashburn, Inc.*, 78 B.R. 355 (Bankr. N.D.Ga.1987); *see generally Max Daetwyler Corp. v. Meyer*, 762 F.2d at 297 ("in the absence of some provision within the patent laws authorizing nationwide service of process, the district court's power to exercise in personam jurisdiction is limited by Fed.R.Civ.P. 4(e) and by the Pennsylvania long-arm statute, whose incorporation by reference Rule 4(e) requires").

This non-uniform approach to the exercise of personal jurisdiction over foreign defendants in bankruptcy cases was discussed by commentators in 1995. Adams & Iverson, "Personal Jurisdiction in the Bankruptcy Context: A Need for Reform," 44 *Cath.U.L.Rev.* 1081 (Summer, 1995); Silberman, "Far Reaching Changes: The Future Expansion of Personal Jurisdiction Over Foreign Defendants Under the Federal Rules of Bankruptcy Procedure," 11 *Bankr.Dev.J.* at 830–833. They suggested in 1995 that the Bankruptcy Rules be amended to correspond to the 1993 version of Fed.R.Civ.P. 4(k)(2):

> . . . the amended version of FRCP 4 can alter the traditional personal jurisdiction analysis for federal courts. In particu-

lar, amended FRCP 4(k)(2) expands the federal judiciary's ability to assert jurisdiction in federal question cases. Rather than permit the exercise of jurisdiction only when a defendant has adequate contacts with the forum state, amended FRCP 4 allows courts to exercise jurisdiction based upon nationwide contacts. The amended rule addresses the concern that, because of differing jurisdictional standards under various state long-arm statutes, a foreign defendant could be amenable to process in one state but not another, despite having the same contacts with both states. FRCP 4 creates a federal long-arm statute, which, in effect, should prevent such inconsistencies.

Beyond the dicta in *Levant* interpreting Rule 7004(e) under amended FRCP 4, the likely impact of the amendment remains uncertain. Accordingly, this Article recommends that the Bankruptcy Rules be revised to enact a provision espousing worldwide service of process in bankruptcy cases. Because bankruptcy court jurisdiction relies upon federal question jurisdiction, a worldwide service of process provision would not conflict with or overbroaden amended FRCP 4. Amending the Bankruptcy Rules in a manner consistent with amended FRCP 4 would serve the admirable goals enunciated in the *Ace Pecan* decision: (1) the assurance that bankruptcy court jurisdiction be exercised to its fullest scope; and (2) the need for federal jurisdictional in bankruptcy cases to be addressed uniformly.

Adams & Iverson, "Personal Jurisdiction in the Bankruptcy Context: A Need for Reform," 44 *Cath.U.L.Rev.*, at 1101–02 (footnotes omitted).

The reference to the 1993 amendment to the federal civil procedural rules concerned Rule 4(k)(2), which provided:

(2) If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

"That rule provides for personal jurisdiction over a foreign defendant if: 1) plaintiff's claim arises under federal law; 2) the defendant is not subject to personal jurisdiction in any state; and 3) the defendant has 'significant nationwide contacts,' *American Tel. & Tel. Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 589–590 (9th Cir.1996), such that the exercise of jurisdiction by a U.S. court comports with Constitutional requirements of due process." *R. Griggs Group Ltd. v. Consolidated Shoe, Inc.*, 1999 WL 226211, *2 (N.D.Cal.1999). As explained by another court:

Rule 4(k)(2) thus sanctions personal jurisdiction over foreign defendants for claims arising under federal law when the defendant has sufficient contacts with the nation as a whole to justify the imposition of United States' law but without sufficient contacts to satisfy the due process concerns of the long-arm statute of any particular state.

*World Tanker Carriers Corp. v. M/V Ya Mawlaya*, 99 F.3d 717, 720 (5th Cir.1996).

"The purpose of Rule 4(k)(2) was to close a loophole that would otherwise allow a foreign defendant with sufficient contacts with the United States to evade enforcement of federal law simply because its contacts were spread too thinly across various states to support jurisdiction in any one state. *See* Fed.R.Civ.P. 4(k)(2) advisory committee's note." *R. Griggs Group Ltd. v. Consolidated Shoe, Inc.*, 1999 WL 226211, *2. Thus, amended Rule 4(k)(2)

was designed to serve as a federal long-arm statute which could be utilized by plaintiffs in district court against foreign defendants in certain types of federal litigation. *See* Siegel, *Supplemental Practice Commentaries*, Fed.R.Civ.P. 4, 28 U.S.C.A., cmt C4–35 (West 1999); *In re Med–Atlantic Petroleum Corp.*, 233 B.R. 644, 652–53 (Bankr.S.D.N.Y.1999).

## B.

In 1996, the Supreme Court enacted new Fed.R.Bankr.P. 7004(f) and abrogated former Rule 7004(e).[11] *See* Advisory Committee Note (1996); *In re Med–Atlantic Petroleum Corp.*, 233 B.R. at 653. Subsection 7004(f) now provides:

f) *Personal jurisdiction*

If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service in accordance with this rule or the subdivisions of Rule 4 F.R.Civ.P. made applicable by these rules is effective to establish personal jurisdiction over the person of any defendant with respect to a case under the Code or a civil proceeding arising under the Code, or arising in or related to a case under the Code.

"Thus, under the new rule, personal jurisdiction may be obtained in proceedings under the Bankruptcy Code over nonresidents who are served in conformity with Rule 7004(a) or the applicable subdivisions of Fed.R.Civ.P. 4 ('Civil Rule 4') so long as the exercise of jurisdiction is consistent with the Constitution." *In re Pintlar Corp.*, 133 F.3d 1141, 1144 (9th Cir.), *cert. denied sub nom. Rowland v. Goodson*, 524 U.S. 933, 118 S.Ct. 2334, 141 L.Ed.2d 706 (1998).

While the purpose behind new Bankruptcy Rule 7004(f) was to establish a federal long-arm provision similar to that provided by Fed.R.Civ.P 4(k)(2), *see* Advisory Committee Note (1996), the drafters of the new provision recognized that there were certain differences between bankruptcy litigation and other federal litigation which made incorporation of Rule 4(k)(2) in the bankruptcy procedural rules inappropriate. Thus, Bankruptcy Rule 7004(a) expressly incorporates certain subsections of Fed. R.Civ.P. 4, but omits any reference to subsection 4(k). Moreover, the language of Rule 7004(f) differs from that of Rule 4(k)(2) in significant ways.

For example, there is no reference in Bankruptcy Rule 7004(f), as there is in Rule 4(k)(2), that limits its scope to defendants "who [are] not subject to the jurisdiction of the courts of general jurisdiction of any state." *See In re Pintlar Corp.*, 133 F.3d at 1146. In addition:

... Rule 7004(f)'s application is narrower than Civil Rule 4; Rule 7004(f) is limited to cases or civil proceedings arising or related to a case under the Bankruptcy Code. Finally, the advisory committee statement relied on by defendants is further explained by the sentence immediately following which states, "[Rule 7004(f) ] clarifies that service or filing a waiver of service in accordance with this rule or the applicable subdivisions of F.R.Civ.P. 4 is sufficient to establish personal jurisdiction over the defendant." Fed.R.Bankr.P. 7004(f) advisory committee notes. That statement confirms that the drafters' purpose was to incorporate the service provisions of the amended Civil Rule 4, not its limitation on personal jurisdiction.

*Id.*, at 1146.

As a result, the application of Rule 7004(f) was to be consistent with the scope

---

**11.** Thus, defendant's reference in its memorandum to decisions construing former Rule 7004(e), such as *In re Crown Hotels (Washington) Corp.*, 188 B.R. 1 (Bankr.D.D.C.1995), are not persuasive.

of subject matter jurisdiction over adversary proceedings in bankruptcy cases. *Id.*, at 1146 n. 3; *see also* Silberman, "Far Reaching Changes: The Future Expansion of Personal Jurisdiction Over Foreign Defendants Under the Federal Rules of Bankruptcy Procedure," 11 *Bankr.Dev.J.* at 836:

> In summary, Congress created the Bankruptcy Code in order to permit a bankruptcy trustee or debtor in possession to consolidate all of the debtor's assets and litigation concerning those assets in one place. It follows that allowing for worldwide service under the new Rule 4 will only further enable the efficient administration of a debtor's bankruptcy since foreign defendants who might otherwise escape a bankruptcy proceeding will now be subject to a bankruptcy court's jurisdiction.

(discussing the advantages of amending then Rule 7004 to be similar to new Rule 4(k)(2)).

Therefore, in these two adversary proceedings, it is the long-arm provision of Rule 7004(f) which is relevant, not the long-arm statute of the Commonwealth of Pennsylvania. This means that the proper exercise of personal jurisdiction must focus upon the "minimum contacts" of Paques, B.V. with the United States, and not simply with Pennsylvania. *See In re Celotex Corp.*, 124 F.3d 619, 630 (4th Cir.1997):

> On the topic of whether the exercise of personal jurisdiction over Rapid is consistent with the Constitution and laws of the United States, the question of whether Rapid had minimum contacts with West Virginia is irrelevant. This is so because when an action is in federal court on "related to" jurisdiction, the sovereign exercising authority is the United States, not the individual state where the federal court is sitting.... Rather, we need only ask whether Rapid

has minimum contacts with the United States such that subjecting it to personal jurisdiction does not offend the Due Process Clause of the Fifth Amendment to the United States Constitution.

(citation omitted).

Thus, I must consider whether the plaintiffs have demonstrated that defendant Paques, B.V. had "minimum contacts" with the United States justifying the exercise of personal jurisdiction. If such contacts are shown, then I must consider whether it would be fair and reasonable to exercise such jurisdiction.

## VI.

Both plaintiffs argue that there are sufficient contacts with the United States for the valid assertion of personal jurisdiction over Paques, B.V. Indeed, they maintain that both "specific" as well as "general" jurisdiction has been demonstrated. They also suggest, though, that personal jurisdiction lies because Paques, B.V. is the alter ego of the Pennsylvania debtor corporation.

## A.

▮▮▮▮ The Third Circuit has explained: "The 'classical' piercing of the corporate veil is an equitable remedy whereby a court disregards 'the existence of the corporation to make the corporation's individual principals and their personal assets liable for the debts of the corporation.'" *In re Blatstein*, 192 F.3d 88, 100 (3d Cir.1999) (quoting *In re Schuster*, 132 B.R. 604, 607 (Bankr.D.Minn. 1991)). "[T]he factors weighing in favor of piercing the veil include: failure to observe corporate formalities, non-payment of dividends, insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant shareholder, non-functioning of other officers or directors, absence of corporate records, and

the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders." *In re Blatstein,* 192 F.3d, at 100.

In addition to creating liability for the corporate shareholder, piercing the corporate veil may also serve to provide personal jurisdiction of a non-United States parent based upon the activities of its United States subsidiary. *See, e.g., Hargrave v. Fibreboard Corp.,* 710 F.2d 1154 (5th Cir.1983); *see generally, e.g., U.S. v. Scophony Corp. of America,* 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed. 1091 (1948); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.,* 402 F.Supp. 262, 328–29 (E.D.Pa.1975). As the "alter ego" of the parent, the conduct of the subsidiary provides the minimum contacts needed to assert jurisdiction.

The ownership by a foreign corporation of a U.S. subsidiary does not, by itself, provide a basis for the assertion of jurisdiction over the parent. A particularly "close" relationship may, however, justify such jurisdiction. As discussed by one appellate court:

> Generally, a foreign parent corporation is not subject to the jurisdiction of a forum state merely because its subsidiary is present or doing business there; the mere existence of a parent-subsidiary relationship is not sufficient to warrant the assertion of jurisdiction over the foreign parent. . . . It has long been recognized, however, that in some circumstances a close relationship between a parent and its subsidiary may justify a finding that the parent "does business" in a jurisdiction through the local activities of its subsidiaries. . . . The rationale for such an exercise of jurisdiction is that the parent corporation exerts such domination and control over its subsidiary "that they do not in reality constitute separate and distinct corporate entities but are one and the same corporation for purposes of jurisdiction." 2 *J. Moore & Lucas, supra,* at 4–273. . . . Problems arise, however, in articulating the type and degree of control necessary to ascribe to a parent the activities of its subsidiary.

*             *             *             *             *             *

> *Cannon [Manufacturing Co. v. Cudahy Packing Co.,* 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925) ],* then, stands for the proposition that so long as a parent and subsidiary maintain separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other. . . . We have noted often that 100% stock ownership and commonality of officers and directors are not alone sufficient to establish an alter ego relationship between two corporations. . . . Generally, our cases demand proof of control by the parent over the internal business operations and affairs of the subsidiary in order to fuse the two for jurisdictional purposes. . . . The degree of control exercised by the parent must be greater than that normally associated with common ownership and directorship. . . . All the relevant facts and circumstances surrounding the operations of the parent and subsidiary must be examined to determine whether two separate and distinct corporate entities exist.

*Hargrave v. Fibreboard Corp.,* 710 F.2d at 1159–60 (citations omitted).

Given the limited nature of the evidentiary hearing held—to determine whether personal jurisdiction may be assessed—I am hesitant to reach a conclusion on an issue—*alter ego* liability—so connected to the underlying merits of these adversary proceedings. I find that I need not do so.

It is not essential that alter ego status be proven in order for a federal

court to have jurisdiction over a foreign parent corporation. *Accord, e.g., In re Telectronics Pacing Systems,* 953 F.Supp. 909, 915 (S.D.Ohio 1997). The relationship between the two corporations, the level of control exercised over the subsidiary, indeed the level of interaction between the corporations may be considered when determining whether due process principles would be violated by the assertion of jurisdiction over the parent. *Id.; Electro Medical Equipment Ltd. v. Hamilton Medical AG,* 1999 WL 1073636, *8 (E.D.Pa.1999); *Superior Coal Co. v. Ruhrkohle, A.G.,* 83 F.R.D. 414, 421 (E.D.Pa.1979).

It is to that issue, within the confines of the constitutionally required "minimum contact" standard, to which I now turn.

### B.

■ For purpose of deciding the jurisdictional question only, I shall assume that Paques, B.V. is not the "alter ego" of Paques, Inc. the debtor. Nonetheless, Paques, B.V. has exhibited numerous contacts with the United States, including specific actions taken in Pennsylvania and Texas, which warrant the imposition of *in personam* jurisdiction as consistent with due process under the Fifth Amendment.

First, it has done some business in the United States for a number of years, including selling machinery, designing reactors, and licensing technology. Its employees have traveled to this country on business ventures. It holds a thirty percent interest in a joint venture which is a Delaware corporation. It has a wholly-owned Pennsylvania corporation as a subsidiary.

Second, in connection with the Houston project, which is the subject of one of the lawsuits, it provided more than $600,000.00 in goods and services. The debtor's president thought Paques, B.V. may be viewed as one of the subcontractors on that pro-

ject. It allowed its employees to be involved in the construction project, or to be loaned to the debtor for work on the project. The project owner, Anheuser–Busch, was informed as part of the bid process that Paques, B.V. would assist and oversee its subsidiary in the management of the project. *See Glinka v. Abraham and Rose Co. Ltd.,* 199 B.R. 484, 497 (D.Vt.1996) (commercial transaction was the subject the adversary proceeding); *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.,* 192 B.R. 73, 80 (S.D.N.Y.1996) (proceeds of receivables and communications connected with the claims made support minimum contacts with United States), *reconsideration denied,* 1996 WL 132097 (S.D.N.Y.1996).

Third, in its dealings with its debtor/subsidiary, it guaranteed the debtor's lease of non-residential real estate in Pennsylvania for about ten years. It provided employees to assist the debtor in its administration and operations. Officers and directors of the debtor were drawn from or overlap with officers and directors of Paques, B.V. There were substantial intercompany debits and credits. The debtor paid substantial sums to Paques, B.V. within the year before its bankruptcy filing. The debtor purchased equipment and machinery from Paques, B.V., and licensed its technology. And Paques, B.V. used the services of an employee of the debtor—Mr. Tielbaard—for its own business purposes: the joint venture agreement with ADI Capital, Inc. *See In re Telectronics Pacing Systems, Inc.,* 953 F.Supp. 909, 920–21 (S.D.Ohio 1997) (relationship between foreign parent and U.S. subsidiary justified jurisdiction over foreign defendant).

Fourth, Paques, B.V. did conduct at least some business from an office in Exton, Pennsylvania. It signed its joint venture agreement with ADI Capital there. Its website formerly referred to its U.S.

office in Exton. It signed correspondence suggesting that Paques, B.V. operated from the Exton office. *See In re Chase & Sanborn Corp.*, 835 F.2d 1341, 1346 (11th Cir.1988) ("the record supports the finding of the district court that the defendants conducted numerous international business transactions utilizing their bank accounts in Miami, as well as New York, Chicago, and San Francisco"), *rev'd on other grds. sub nom. Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989).

Taken together, this conduct supports the exercise of general personal jurisdiction as well as specific jurisdiction. There were extensive inter-company dealings over a period of time involving employees of the defendant with United States activities of its subsidiary. The defendant has derived significant revenues from its business relationships in this country. It has held itself out to others as having an office in this country. It has been involved in business activities in this country for a number of years.

Moreover, the claims raised against Paques, B.V. by MK arise largely from its activities with the Houston project, for which it supplied goods and services and had its employees involved. The claims of the Committee are largely derived from the defendants dealings with Paques ADI, Inc.—a joint venture company whose formation occurred in the Exton, Pennsylvania office.

Accordingly, the exercise of personal jurisdiction over this defendant is permissible. *See generally Electro Medical Equipment, Ltd. v. Hamilton Medical AG*, 1999 WL 1073636, *8–10; *Matter of Harvard Industries, Inc.*, 173 B.R. 82, 89 (Bankr.D.Del.1994). *Compare BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.*, 229 F.3d 254 (the activities of the defendant arose outside of the United States and were unrelated to any claim arising in this country); *cf. Van Buskirk v. Carey Canadian Mines, Ltd.*, 760 F.2d at 491 (if a foreign corporation knows that shipments of product have been sent to Pennsylvania for a number of years, it will be subject to that state's long-arm statute if such product causes injury in that state).

Finally, in addition to its contacts with the United States, I also note the defendant's connection to the instant bankruptcy case.

As the sole shareholder, Paques, B.V. in essence authorized the debtor's bankruptcy filing. Moreover, Paques, B.V. is a creditor in this case and may have the same distribution rights as other creditors. Finally, its attorneys "enter[ed] [their] appearance ... on behalf of creditor Paques BV," as permitted by Rule 2002(g). Docket Entry # 61 (filed November 12, 1999). Indeed, one court suggests that this entry of appearance may be sufficient to justify the assertion of personal jurisdiction. *See In re Deak & Co., Inc.*, 63 B.R. 422, 432 (Bankr.S.D.N.Y.1986):

> By filing his notice of appearance, DAMA has indicated and, in essence, declared himself to be not only interested in these proceedings but to have acknowledged that his interests are affected. He has requested that this court give express recognition to his status and has purposefully availed himself of the privileges and benefits of conducting judicial activities within the United States.... In this context, DAMA has voluntarily interjected himself into these proceedings and by his presence has indicated his consent to jurisdiction over matters involving him.

(citation omitted).

Certainly, by virtue of this filing, Paques, B.V. has been notified of motions, applications and other filings in this case

which it has monitored through its local counsel.

## VII.

The final issue left for discussion concerns the fairness and reasonableness of requiring Paques, B.V. to defend against these two lawsuits in a bankruptcy court located in Pennsylvania, U.S.A. For the following reasons, I conclude that this defendant has not met its burden to demonstrate that the exercise of personal jurisdiction over it would be unfair and unreasonable.

As noted earlier, I apply the following standard to this determination:

> Now that Plaintiff has established that Communicorp has sufficient minimum contacts with the United States to justify this court's exercise of specific jurisdiction, Communicorp "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174. Courts, in determining whether subjecting a defendant to jurisdiction is fair and reasonable, should consider the following factors: the burden on the defendant, the interests of the forum, the plaintiff s interest in obtaining relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies.

*U.S. v. Famous Artists Corp.,* 1996 WL 114932, *6 (E.D.Pa.1996).

First, Paques, B.V. has very substantial contacts with the United States. Not only does it do business in this country, but it authorized its subsidiary to file a bankruptcy case in this forum. Its employees and officers are frequent visitors to this country and to this region. It has local counsel familiar with the claims asserted.

It has made use of an office in Exton, Pennsylvania for business purposes.

Second, at the time of this filing, the defendant was involved in litigation arising out of the A–B construction project. It knew or should have known that such litigation would continue here in this bankruptcy case.

Third, the broad subject matter jurisdictional grant in bankruptcy cases recognizes that this court is the only forum that can efficiently resolve all of the litigation involving the construction project and the license transfer from the debtor. The Committee, A–B, MK and the debtor all have urged this court to assert its jurisdiction over these issues. As capable as the courts may be in the Netherlands, they could not obtain the requisite jurisdiction to resolve all of these claims. Thus, there may be no viable alternative to this forum.

Finally, these claims asserted by the bankruptcy estate against Paques, B.V., along with the debtor's claims against A–B, represent the vast bulk of assets available for distribution to creditors. The creditors' committee asserts that a domestic corporation has been seriously harmed by defendant's conduct. A prompt and efficient determination of this litigation is of great significance in this chapter 11 case.

The balance of interests strongly tips in favor of this court's exercise of in personam jurisdiction in these circumstances. *See In re Banco Latino International,* 176 B.R. at 284–85; *Matter of Harvard Industries,* 173 B.R. at 90; *see also Application to Enforce Administrative Subpoenas Duces Tecum of S.E.C. v. Knowles,* 87 F.3d 413, 418 (10th Cir.1996); *Staffin v. Greenberg,* 509 F.Supp. 825, 832 (E.D.Pa. 1981), *aff'd,* 672 F.2d 1196, 1208 (3d Cir. 1982); *cf. Deluxe Ice Cream Co. v. R.C.H. Tool Corp.,* 726 F.2d 1209 (7th Cir.1984)

(concluding that it was no violation of due process to require a Netherlands corporation to defend itself in a federal court in Illinois).

Accordingly, for these reasons, the defendant's request that these two lawsuits be dismissed for lack of personal jurisdiction must be denied, insofar as they concern the exercise of authority under the Fifth Amendment of the United States Constitution. The due process rights of Paques, B.V. would not be violated by the exercise of personal jurisdiction over that entity in this forum.